UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  3:15-cv-30071-MAP

_____

| | | |
|---|---|---|
| KATIE KING, | ) | |
| Plaintiff, | ) | **DEFENDANT'S MEMORANDUM** |
| | ) | **OF LAW IN SUPPORT OF ITS** |
| v. | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| MESTEK, INC., | ) | |
| Defendant. | ) | Dated: February 10, 2017 |

### INTRODUCTION

The Defendant moves for summary judgment on the remaining counts of the Plaintiff's complaint.  This case arises out of Mestek, Inc.'s elimination of Plaintiff's position, Assistant Controller. The case alleges:  Counts I and VII, disability discrimination in violation of the ADA and ch. 151B (real and perceived); Counts II and VIII, hostile work environment harassment based on disability, in violation of the ADA and ch. 151B; and retaliation, Counts IV,VI and X, in violation of the ADA, ch. 151B and the Family and Medical Leave Act (FMLA).

Summary Judgement should be granted in favor of the Defendant on all the Plaintiff's claims because after having adequate opportunity for discovery, including the Plaintiff's testimony, there is no genuine issue as to any material fact.  In each pending count, the Plaintiff lacks evidence to support one or more essential elements of her claim and the Defendant is entitled to judgment as a matter of law. FRCP56(c)(1)(B)*; Celotex Corp. v. Catrett, 477 US 317, 325 (1986).*

### I.      STATEMENT OF  FACTS

The Plaintiff was employed by the Defendant as an Assistant Controller from July 2012 to June 2, 2014, when her position was eliminated.  Plaintiff's Amended Complaint (Dkt. No. 13, hereinafter "Am. Compl.") ¶¶ 4, 24.

Before working at Mestek, Plaintiff was employed in cost accounting positions.  She voluntarily left those for career-development opportunities including becoming a Financial Analyst with a goal of Controller.  (King Depo. Vol. I, 33:16; 34:1-5; 34:11; 35:5-6).  (King Depo. Vol. I, 37). The Financial

Analyst position at the previous employer was similar to the Assistant Controller position she held at Mestek. (King Depo. Vol. I, 37:20-23).  Both the position of Financial Analyst and Assistant Controller require greater knowledge than a Cost Accountant. (King Depo. Vol. I, 41:19-42:2).

In July 2012, Defendant employed Fran Robertson, Controller, as well as a CFO, Mr. Shea.  Mr. Shea made the final decision to hire the Plaintiff.  (Berwald Depo.15:16-19).   Joanne Berwald, the Vice President of Human Resources was involved in the interview process of the Plaintiff.  (Berwald Depo. 16:2-5).  In addition, Mr. Shea made the final decision regarding whether to eliminate the position of Assistant Controller.  (Berwald Depo. 66:1-8).

At the time of hire, Plaintiff reported to the Controller, Mr. Robertson.  As the Mestek Assistant Controller, Plaintiff was responsible for Company 001, a major part of Defendant's HVAC business which included multiple locations.  (King Depo. Vol. I, 46:13-18).  The position of Assistant Controller required Plaintiff to maintain an accurate general ledger. (Moriarty Depo. 13:18-24).

In March of 2013, Mr. Robertson abruptly retired with 2-weeks' notice and the decision was "shocking" to everyone. (King Depo. Vol. I, 47:7-11). (King Depo. Vol. I, 48:4-9).  No information about a succession plan was provided.  (King Depo. Vol. I, 48:10-12).

When Robertson retired, the department was in a state of flux as could happen when you have a more senior person leaving, but also because at the same time, John Reed, the Chairman, CEO & owner, died.  Mr. Shea was involved in the estate and the estate filings as it impacted or related to the Company. In addition, in the Plaintiff's department, the person holding the position of Cost Manager had announced his intention to retire.  The Company did not know what it was going to do with Plaintiff's position. (Berwald Depo. 43:6-12; 51:1-21).

The concept of restructuring following Mr. Robertson's retirement was a long process which went on for several months. (Zambelli Depo.60:8-18; Berwald Depo. 53:19-54:18.).  The analysis related to restructuring had been general practice after every opening.  Specifically, the Company evaluates the department to determine whether the company will replace the position that has become vacant.  The analysis regarding the Controller position triggered the analysis of every other position in

the Finance Department.   Eventually, the analysis determined that the Controller position would be eliminated and the Assistant Controller of HVAC position was also eliminated.  (Berwald Depo. 53:19 ó 54:18; 57:5-14).   Eliminating Plaintifføs position was made as part of a restructuring of the Finance Department contemplated to reduce redundancy and enhance both efficient and cost effectiveness. (Defendantøs Response to Plaintifføs Interrogatories).   Certainly the death of Mr. Reed impacted the length of the process but during the process, it was determined that there were other people in the department who could handle additional duties such as Anna Matovich.  (Berwald Depo. 4:24).   During this general process, the Company looks at the entire department to see if there are any other structural changes the Company should make; it is looked at as a department, not specifically just as a person. (Berwald Depo. 58:10-18).

The first time Mr. Zambelli communicated about terminating Plaintiff was in 2013. (Zambelli, Depo. 14:15-16).  The discussion first was about restructuring; the corporate controller left, therefore eventually the Company needed to restructure because it was decided he wasnøt going to be replaced. (Zambelli, Depo. 14:17-23).  Once the Company decided there would not be a Controller, there was no longer a need for an Assistant Controller.  (Zambelli, Depo. 15:2-3).  Simply stated, õWe were not replacing Franøs position as a Controller of HVAC and she had nobody to report to.ö  (Berwald Depo. 53:7-12).

Plaintiff did not assume any of the responsibilities of Controller and the job of Assistant Controller was unchanged. (Zambelli Depo. 60:23; 64:1).  It was clear that Plaintiff would not be able to perform the duties of the Corporate Controller.  (Zambelli Depo. 61:3-10).

In all, three positions within the Finance Department have been eliminated.   (Defendantøs Response to Plaintifføs Interrogatories).

From March 2013 to June 2014, the Controller vacancy never was advertised. (King Depo. Vol. I, 63:10-19) (Zambelli Depo. 63:10-19). (Berwald Depo. 52:18-21).

Plaintiff was never concerned that if the Company did not fill the Controller position, then the Assistant Controller position could be eliminated.  (King Depo. Vol. I, 87 ó 88:4). Plaintiff never asked

Mr. Shea or anyone else at Mestek whether or not the Controller position was going to be filled. (King Depo. Vol. I, 83:3-18). She did not find it odd that the Controller position was never posted or filled. (King Depo. Vol. I, 84: 1-11). Plaintiff believed that the work of the Controller had been spread amongst Jeanne Moriarty and Timothy Zambelli. (King Depo. Vol. I,84:12 ó 85:5).

In addition, because of the vacancy and the obligation to analyze the structure of the department, after the Controller retired, Plaintiff did not have a supervisor for a long time ó 6 or 8 months. (Berwald Depo. 42:22 - 43:5). õQuite a while passedö between the Controllerøs retirement and when Plaintiff learned who her supervisor would be. (King. Depo. Vol. I, 79:7-13.).

Mr. Zambelli became Plaintifføs supervisor in October of 2013. See Personnel File Action Form, October 2013.

Prior to Mr. Zambelli being announced as Plaintifføs supervisor in October of 2013, Plaintiff was asked whether she would be interested in taking over the position of the Cost Manager. (King Depo. Vol. I, 38:20-39:1; 82:16-19)(Berwald Depo. 51-52)(King Depo. Vol 1, 81:17-24). There was a plan to replace him and have dual training. (Zambelli Depo. 65-66). Because Plaintiff had a cost accounting background, it made sense to offer her the anticipated opening. (Berwald Depo. 51:1-21).

There are differences between Cost Accountant (a/k/a Cost Manager) and a position of Assistant Controller. (Zambelli Depo. 61-62). The position of Assistant Controller has a higher level of responsibility than a Cost Manager. (Zambelli Depo. 63:1-9) (King Depo. Vol. I, 41:19-42:2). The position of Controller [is expected to] add business value (compared to Cost Manager) and the Defendant believed that Plaintiff could not add business value. (Zambelli Depo. 62:3-11).

The person who offered Plaintiff the move to Cost Manager position was CFO Steve Shea; specifically, he asked Plaintiff if she was interested in õgoing back to thatö and Plaintiff responded that she õwas very happy with [her] career succession.ö (King Depo. Vol 1, 82:1-11). Mr. Shea responded that he understood that she did not want to go back to that at that time. (King Depo. Vol 1, 82:12-15).

The restructuring discussions continued after Plaintiff rejected the offer to replace the Cost Manager. (Zambelli Depo. 67:2-10). By October 2013, when Mr. Zambelli became Plaintifføs

4

supervisor, it had become õobviousö to all of us that she wasnøt capableö of taking on additional responsibilities such as those of controller.  (Zambelli Depo. 65).[1]

When Mr. Zambelli became Plaintifføs supervisor, he did not believe Ms. King was satisfactorily performing.  (Zambelli Depo. 72:1-3).  It had been his experience that Plaintiff made repeated mistakes where she never seemed to learn from the previous one; she did not understand simple general ledger accounting after many months to a year or more; there were several issues where there was very clearly no effort put into reviewing work by Plaintiff because Mr. Zambelli and Ms. Moriarty constantly had to go back; after Plaintiff would comment that everything was õall  set and reviewedö Mr. Zambelli and Ms. Moriarty identified her errors and she would need to fix those.  The pattern of poor work performance was repeated.  (Zambelli Depo. 72-73).

While the Assistant Controller position was eliminated, no one took over Plaintifføs job. (Zambelli Depo. 15:6-8)(Moriarty Depo.16:20-22) (Berwald Depo. 52:7-17).  Responsibilities were split up among different individuals and people were reshuffled.  (Zambelli Depo. 15:6-10)(Berwald Depo. 49:19-24).  Anna Matovich took over some Ms. Kingøs responsibilities after the position was eliminated. (Moriarty Depo. 16:20-22).  At the time her position was eliminated, the Company did not have any open positions for which she would have been qualified.  (Berwald Depo. 52-53).

Anna Matovich had the title of Staff Accountant and had been employed for a few years before Plaintiff was hired. (Berwald Depo. 55:9-18) (Zambelli Depo.17:15-20).   When Steve Shea was making the decision regarding the position elimination, he noted that Ms. Matovich had been employed longer that Plaintiff and had more experience with the Defendantøs product lines. (Defendantøs Response to Plaintifføs Interrogatories).  Ms. Matovich had worked at Mestek for over 9 years and has a BA and an MA. (Moriarty Depo.16:23 ó 17:3).

---

[1] Performance evaluations ó are not performed. After the downturn, õwe just donøt do performance evaluationö. In 2009, with the wage freeze, Mr. Zambelli didnøt get one.  (Zambelli Depo. 10:10 - 11).  The Finance Department does not do review, formal review.  (Berwald Depo. 4-10).  There is no progressive discipline policy at Mestek that applied to Ms. King. (Berwald Depo. 23:1-3).

Plaintiff recognized Anna Matovich assumed some of Plaintiff duties because Ms. Matovich had a basis of knowledge; Ms. Matovich performed the job duties before Plaintiff was hired and while Plaintiff was out on leave.  (King Depo. Vol, 1, 175:22-24).

The questions Plaintiff would ask and Ms. Matovich sometimes answered, were continuously of the same substance and sometimes remedial.  (Moriarty Depo. 64:21 ó 65:8).  Plaintifføs mistakes were serious and it was her responsibility to have accuracy. (Moriarty Depo. 67:3-9).  The mistakes were numerous. (Moriarty Depo. 67:16-18).  Ms. Moriarty complained to Mr. Zambelli and Mr. Shea about Plaintifføs work quality. (Moriarty Depo. 68ó69). Plaintiff was wasting Moriartyøs time (Moriarty Depo. 65:9-19).

Ms. Moriarty õdefinitelyö had problems with Plaintifføs work quality because Plaintiff should have been providing a clean General Ledger to Ms. Moriarty to allow Ms. Moriarty to do her job. However, Ms. Moriarty repeatedly found errors in the work produced by Plaintiff which meant that Ms. Moriarty would have to audit Plaintifføs work. (Moriarty Depo. 48:18 ó49:9).   Ms. Moriarty testified, õItøs not my job to do a re-audit or [Plaintiff]øs workö and she found it frustrating. (Moriarty Depo. 49:10-13).  Examples of written exchanges with Plaintiff are attached with a cover sheet and summary which includes documents related to the matters to which Mr. Zambelli and Ms. Moriarty made reference.

By October 17, 2013, Mr. Zambelli and Ms. Moriarty had an exchange documenting Mr. Zambelliøs decision that Plaintiff should not be retained:

*Moriarty: "It's time to give Katie a refined job description.  I am sick of doing her job."*

*Zambelli: "She is awful.  I take back what I said about being ok keeping her around. No matter how much I guide her and practically give her the answer she still asks questions and can't figure it out.  Best one was this morning I asked her about an adjustment she wanted to make for freight that I didn't agree with.  She said I was right and it wasn't necessary 'after she looked at it a different way.' Oh. You mean the right way?!."* (000596-000597)

In addition, in October of 2013, Complainant received a strongly worded negative assessment regarding Plaintifføs performance. The written assessment was authored by Ms. Moriarty, in

6

consultation with and agreement by Mr. Zambelli.    (Moriarty Depo.12:11-19).    When Moriarty conferred with Plaintiff's supervisor and then sent the email, Ms. Moriarty did not believe Plaintiff was performing her job satisfactorily.  (Moriarty Depo. 49:23 ó50:2). Mr. Zambelli believed an email saying Plaintiff was not doing well was a warning because it put the employee on notice that they are not doing well.  (Zambelli Depo. 6:23- 7:16).  The October 2013 email to Plaintiff (*King Depo. Vol. I, Ex. 9*) states:

- *Oct. 16, 2013, instruction to Lisa Lannon and Katie King requesting the performance of their job duties to allow Moriarty to complete her job duties.*

- *Oct. 23, 2013 9:52 a.m. email from Moriarty, copy to Zambelli, stating the following to Plaintiff:*

  *"Katie–*
  *I never received any feedback from you on this email.  I want to point out this was not a casual request to browse over the financial statements at your leisure.  It is our collective responsibility to assure the statements issued are accurate and that we understand the numbers that make up the values presented. As Assistant Controller I feel you should be providing far more input beyond telling me that the company 001 GL is ready for allocations.  It is your area of responsibility to point out the anomalies to us before we have to ask.  The questions that I asked of you Thursday should have be (sic) things you already noticed, investigated and communicated to us.*

  *There are too many divisions in Mestek to analyze the last minute and a proactive approach on your part is necessary to facilitate a timely closing.  For the September closing I had to ask multiple questions on advertising expense without getting clear answers.  I believe you should be reviewing the manufacturing and operating expenses for accuracy every month and communicating any deviations from budget and/or prior period results that vary in a material fashion.  You should make an effort to learn the product lines so that reclass issues are apparent to you; something I believe you should know after a year and half in your position.*

  *Tim and I discussed this issue and we are committed with making sure this doesn't continue.  I am pointing this out to you so that you understand our expectations and can provide value to the quality of the financial statements.  It is imperative that you are able to add value to the process for your personal career development here or anywhere for that matter.  To anticipate the questions that will arise, have clear explanations and show an understanding of the statement's contents will provide the highest value to our team. Currently I feel like we need to question everything.  While you may understand somethings as correct I hope you see the need to communicate the anomalies so that we are all on page.*
  *Please consider this a bit of tough love.  <u>If you are to be a valuable team member this is what is necessary to fill the bill</u>. (emphasis added)."*

7

From the time Ms. Moriarty sent the October email, until March of 2014, Moriarty never thought Plaintiff was performing satisfactorily or improving her performance. (Moriarty Depo. 50:10-17). The on-going errors captured after the October 30th emails are attached with summary and documents.

Mr. Zambelli viewed the mistakes as serious because Plaintiff did not learn from her mistakes and kept repeating them over and over again which is õvery serious for a master degree in accounting.ö (Zambelli Depo. 38:17-24).

The work in the Finance Department involves a lot of attention to detail. (King Depo., Vol 1, 56:17-21). Plaintiff experienced frustration because of other employees who were making a lot of repetitive mistakes; the same mistake over and over again. (King Depo., Vol 1, 56:22 - 57:1). Mistakes in accounting occur if people donøt understand the whole process. (King Depo., Vol 1, 57:2-6). According to the Plaintiff: (i) someone with a habit of careless or sloppy errors would be frustrating. (King Depo., Vol 1, 57:21 -58:1); (ii) a delay of two weeks would reflect a problem with performance. (King Depo., Vol 1, 59:21 ó 60:4); and (iii) if an employee was not able to remember if the employee did what they were expected to do, Plaintiff would consider that to be poor performance. (King. Depo. Vol. I, 60:7-14).

Plaintiff agrees that repetitive failures or delays in job duties is a valid basis for criticism and she knows that Mr. Zambelli referred to non-disabled employees, who never took FMLA leave, to be õjerksö when they displayed such a pattern. (King Depo. Vol II, 56:21-57:1; and 57:17-21).

When another employee failed to perform, which in turn impacted Plaintifføs ability to perform her job responsibilities, Plaintiff was concerned that the Finance Department as a whole would look like it was not doing its job. She was concerned someone in management would think the entire Department was not performing. (King Depo. Vol II, 54-56:20; Depo. Ex. 20; Email June 4, 2013).

Annette Suski also worked in the Westfield Office in payroll. (King. Depo. Vol. I, 51:16-20).

Ms. Suski was difficult to deal with. (King Depo. Vol. I, 52:12-14). Sometimes it was frustrating being õstuck between a rock and a hard place trying to get what I needed to know what the account should be and what it actually was to get it cleaned up.ö (King Depo. Vol. I, 52:15 ó 53:2). She

8

was told by Mr. Zambelli or Mr. Robertson that she was responsible for the entire balance sheet and she needed to make sure that her accounts were correct. (King Depo. Vol. I, 53:10-12).

Plaintiff did not deal with the cost manager often but he was frustrating when he would not have performed the work Plaintiff needed to get her job done. (King Depo. Vol. I, 54: 20-24). It was work that he was supposed to have performed but he consistently pushed off his job responsibilities onto other people. She remembers people getting frustrated dealing with him so people would just do whatever and get stuff done. (King. Depo. Vol. I, 55:1 ó23; 55:24 ó56:1-16).

*Performance Comparator in Finance Dept. (Annette)*

Annetteøs poor performance had a negative impact on Plaintiff performing her job. (Zambelli Depo. 68:19-70:1). Annette was involuntarily separated from employment. (Zambelli Depo. 70:6-7). Annette was not disabled had not taken a medical leave prior to her involuntary separation from employment. (Zambelli Depo. 70:8-11) (King Depo. Vol. I, 62:20-22).

*Medical Issues*

In September of 2012, while off duty, Plaintiff stubbed her toe on a shopping cart and believed she broke her toe. (King. Depo. Vol 1, 89:13-16).

Shortly after she stubbed her toe, she õwent on crutchesö[2] and she asked the CFO if she could have an accommodation related to the dress code (shoes) and if she could park closer to the building instead of crossing the street. (King Depo. Vol. I, 89:13-91:24). Plaintiff cannot recall what the CFO said in response to her request but she began parking in the lot adjacent to the building and she enjoyed a modification to the dress code. (King Depo. Vol. I, 92:1-9). Following this 2012 request, Plaintiff never asked for any other reasonable accommodation (King Depo. Vol. I, 97:24; 98:4).

One treatment provider, John Swierzewski, D.P.M., provided her with a walking boot and another treatment provider told her to stop wearing it[3]. (King Depo. Vol. II, 17:20 -18:16).

---

[2] Plaintiff used crutches but the use of crutches was not prescribed by any physician. (King Depo. Vol. II, 18:21 ó 19:4).

[3] Plaintiff asserts it may have been physical therapist that provided this instruction to stop wearing the boot. Defendant has not received the medical records related to Plaintifføs physical therapist. Plaintiff also received treatment from Dr. Geffert, a podiatrist regarding her injury. Defendant has not received the medical records from that Dr. either.

Plaintiff did not utilized two crutches for the entire period of her employment. By July 3, 2013, Plaintiff was <u>not</u> walking with crutches but only used one crutch when on a set of stairs. (King Depo. Vol II, Ex. 21). Complainant was on medication and felt pain but it did not impact her ability to do her job. (King Depo. Vol I, 96:21-24). Plaintiff presents evidence of a diagnosis for this suit. However, that was not known to the Defendant during 2013 and March of 2014.

*No Knowledge of Disability*

Plaintiff did not report the fact that she was attending physical therapy to any member of management or to Human Resources. (King Depo. Vol. II, 20:20 ó 21:4).

Mr. Zambelli only knew of a õfoot problemö and a õwoman problemö related to bleeding. He didnøt know about her diagnosis. (Zambelli Depo. 20:12-21:8). In July of 2013, when Plaintiff was unexpectedly absent from work, as directed by her physician, for a period of five days (unrelated to her alleged disability), Plaintiff notified Mr. Zambelli. In addition, Plaintiff advised Mr. Zambelli that he could contact her regarding work related matters and that she would check her emails daily. (King Depo. Ex. 26, Vol. II, 79:19 ó 80:20). Mr. Zambelli had not demanded that she check in when absent for medical reasons. (King Depo. Vol. II, 80: 21 ó 81:1).

Plaintiff never had any trouble getting time off. (King Depo. Vol I, 100:1ó3). Mr. Zambelli and Mr. Robertson said not to worry about bringing a medical note for absences. (King Depo. Vol. I, 99:10 ó 24). The medical information received disclosed: (1) December 27, 2012 ó õno walking for todayö (KK-000060(redacted)); (2) January 16, 2013- õhad a procedure and has been advised to rest for the remainder of the day and return to normal activity [the next day]. (KK-000063); (3) February 22, 2013 ó õwas treated today at the pain center.ö (KK-000062); (4) July 23, 2013 ó õunder medical supervisionø and unable to work through July 29, 2013. (KK-000061); (5) February 19, 2014 ó Pt. had spinal cord stimulator implanted. Recommend to be off work for 1 week; (6) February 21, 2014 ó Katie is ok to return to work immediately. KK-000063 (Dr. VU); (7) FMLA certification paperwork: Two (2) week Absence starting April 22, 2014. ó Not admitted to hospital. Can return to work after 2 weeks. Is able to perform her job functions and there wonøt be episodic flare ups periodically preventing the employee

from performing her job functions. (KK 000071-000076); (8) No date ó õwork releaseö May 7, 2014 to May 14, 2014, õPlease excuse from work due to a medical illness.ö  (KK-000079); (9) May 15, 2014 note:  Ms. King is excused from duty until 5/21/13. May return to work on 5/21/14.  (KK-000083); and (10) May 21, 2014. Fitness for Duty Certification ó õAble to perform all essential dutiesö (no restrictions listed).

Ms. Berwald did not know why Plaintiff used crutches (Berwald Depo. 19-20) and only learned why she used them after she was no longer employed. (Berwald Depo. 20:9-13).

Mr. Shea did not know of Plaintifføs disability because when she spoke to him about preferential parking in 2012, she only recently had stubbed her toe.

*October 2013 – One Year of Preferential Parking Without Medical Information; Human Resources Requests*

On or about October 30, 2013, Human Resources contacted Plaintiff and requested she submit a medical note in order to continue using preferential parking, which had been in place for roughly a year. There is no note on file.

*FMLA Request and Leave - March and April 2014*

On or about March 24, 2014, Plaintiff told Mr. Zambelli that surgery had been scheduled and she told Mr. Zambelli that if she could be of any assistance, <u>she would make sure her õstuff was cleanö and ready to go before she left</u>.  She does not recall him having any reaction or making any statements. (emphasis added).  (King Depo. Vol.1, 103- 104:8).

Ms. Moriarty did not talk to Ms. King about her leave.  Ms. King did not tell Ms. Moriarty about her leave because Ms. Moriarty was not her supervisor. Ms. King did not meet with Ms. Moriarty about her leave.  (King Depo. Vol.1, 104:9-18 and Moriarty Depo. 58:17-21).

Mr. Zambelli told Plaintiff that Ms. Matovich would cover for Ms. King during the absence because Ms. Matovich performed Ms. Kingøs job duties before Ms. King was hired. (King Depo. Vol.1, 104:19-24).

Before going out on FMLA leave in April 2014, Plaintiff met with Ms. Matovich, reviewed the checklist on what needed to be done and said that when she returned, she would continue on with the reconciliations that were part of the process (õand I would clean up whateverö). (King Depo. Vol.1, 105:12 ó 106: 3). Ms. King thought Ms. Matovich would cover the two week FMLA even though if she went on vacation no one covered her job responsibilities. (King Depo. Vol.1, 106:8-14). Ms. King set her email away message telling everyone to contact Mr. Zambelli, even though he directed that Ms. Matovich would cover, but she canøt recall if he told her to do that. (King Depo. Vol. I, 108:4-15).

They did not need her assistance while she was out (Zambelli Depo. 59:21-24) and they made zero contact with her. (Zambelli Depo. 60:1-4).

When King returned from FMLA leave, she had no restrictions. The doctor did not write anything about bending, lifting, or twisting for three months because he looked at her job description and said that the restrictions were not part of her job duties. (King Depo. Vol. I, 114:12-23; Ex. 8).

### *The Day Before Her FMLA Leave, April 21, 2014, and Plaintiff's Hostile Work Environment Claims*

For the entire period of employment up to April 21, 2014, Plaintiff:

- Did not experience intimidation (King Depo. Vol. II, 28:9-19);

- Cannot recall experiencing ridicule or insulting behavior (King Depo. Vol. II, 30:3-14);

- Does not remember anything that Jeanne Moriarty did that was harassing. (King Depo. Vol. I, 147:6-10);

- Did not have any problems with Mr. Zambelli and he never said anything to King that made her believe she was being harassed. (King Depo. Vol. I, 156:11-24); and,

The only abusive act she ever endured was being let go. (King Depo. Vol. I, 175:4-9).

The only õharassmentö Plaintiff experienced during her employment occurred on April 21, 2014. õAll the harassmentö related to this case and the interactions with Jeanne Moriarty and Tim Zambelli on April 21, 2014. (King Depo. Vol. I, 177:11 ó 178:2). Other than the April 21, 2014 interactions described below, Plaintiff did not experience anything else she believed was abusive or was offensive. (King Depo. Vol. I, 32; 33:4-14).

*The Events of April 21, 2014 and Alleged Harassment That Day*

At 10:34 a.m., on April 21, 2014, Plaintiff forwarded an email to Ms. Moriarty (King Depo. Vol. I, Ex. 18). The forwarded email originated with Ms. Lannon and stated, "You may want to catch up with Jeanne and find out what allocations need to be updated." Ms. Lannon was forwarding an email exchange dated April 1, 2014 between Ms. Lannon and Ms. Moriarty and a March 24, 2014 email between Ms. Lannon and Plaintiff. In the March 24 email with Plaintiff, Plaintiff asserted that she was told to keep the allocation the same by Ms. Moriarty and that she could not remember who had helped her with the allocation the previous year. Ms. Lannon created the list of accounts and identified those having allocations (i.e. the same as last year) and those having no allocations. On April 1, 2014, Ms. Moriarty confirmed that some of the list should be updated.

The making of the allocations referenced in the email of April 21, 2014 (King Depo. Vol. I., Ex. 18) was Plaintiff's job responsibility (Moriarty Depo. 53:8-14). This was not a topic that was new to Plaintiff. (Moriarty Depo. 53:15-20) and Moriarty had helped the Plaintiff the previous year. (Moriarty Depo. 54 -55).

Ms. Lannon's position was not as significant a position as the Assistant Controller position held by Plaintiff. (Moriarty Depo. 54:22 -55:3). But it was Ms. Lannon who asked about updating the allocation rates from one year to the next even though it was Plaintiff's job to do that. (Moriarty Depo. 55:3-10). Plaintiff should have started and performed the allocation work in March when the January financial statements were issued. (Moriarty Depo. 55:6-56:14).

On April 21, 2014, when Plaintiff forwarded the email to Ms. Moriarty at 10:34 a.m., Plaintiff wrote, "*Jeanne, if you would like to get any of these updated, I will need this information by today as I will be out starting tomorrow and I don't know when I will be returning. If it won't be able to be done, then maybe Tim can go ahead and help you with this.*" Plaintiff copied her supervisor, Tim Zambelli on the email. Plaintiff's email informs Ms. Moriarty that Ms. Moriarty will need to do Plaintiff's job duties related to allocations. Plaintiff's email annoyed Ms. Moriarty because the work should have been done already (by Plaintiff); the job responsibility had not been on her radar for the Jan. closing; and, that she

13

had an outstanding issue that she was bringing up and mentioning giving to Ms. Moriarty as a "this must be done today by [Moriarty]." (Moriarty Depo. 56:3-57:16).

At 10:49 a.m., Ms. Moriarty sent Plaintiff a response which stated,

*"Katie- It's a shame you waited until today to follow up on this issue. If you are going to be out for an extended time a well-planned absence would have included following up on outstanding issues. You are in no position to issue me an ultimatum regarding your duties that you should have well under wraps. This should have been resolved with the January closing. It looks like you will have some reconciliation work to do upon your return."*

"Reconciliation" is an accounting term. A "True-up" is the same thing as reconciliation. "Making adjustments" means the same thing as true-up or reconciliation. (King Depo. Vol. I, 44:23 – 45:19; 46:2-5). These were part of Plaintiff's position. (King Depo. Vol. I, 46:6-12). All the topics of the April 21st email string fell within Plaintiff's job duties. (King Depo. Vol. 1, 137:5-11; 141:7-9). Ms. Moriarty wrote that Plaintiff will do her job duties when Plaintiff returns to work (at the conclusion of her two week leave) (and Ms. Moriarty and Mr. Zambelli would not be doing her past-due responsibilities).

Plaintiff's subjective perception is that the April 21st 10:49 a.m. email from Ms. Moriarty was "harassment" because she found it threatening and offensive. (King Depo. Vol. I, 140:15; 143:10-20; 144:10-20; Vol. II, 30:17-31:5). This was the only harassment Plaintiff experienced throughout her employment prior to her FMLA leave. (King Depo. Vol. I, 144:12-20).

Plaintiff saw no connection between the message in the April 21st email and the message conveyed by Moriarty in the October 23, 2013 email to Plaintiff. (King Depo. Vol. I, 140:22-141:1). Instead, Plaintiff believed the statement, "looks like you would have some reconciling to do upon your return" was threatening because she thought she was being made to feel that she should not have been taking a leave. (King Depo. Vol. I, 139:11-18).

Within five minutes of Ms. Moriarty's April 21st, 10:34 a.m. email, Mr. Zambelli sent a reply to Ms. Moriarty documenting the conversation he had with Plaintiff in the previous moments. Mr. Zambelli, knowing Plaintiff had been approved for a two week leave of absence, advised the Plaintiff that "if she will be out more than two weeks, then she needs to be prepared to be available to help with

14

her responsibilities in some other way including coming in to help or answer questions by phone as to what entries need to be done and when.ö  (Bates 000622; Moriarty Depo. Ex. 3).  The request for Plaintiff to be available after her FMLA leave arose from Plaintifføs written statement that she did not know when she would be returning to work.   Mr. Zambelli did not tell Plaintiff that she needed to be on call 24/7.  (Zambelli Depo. 33:13-20).

After receiving Ms. Moriartyøs response to an email Plaintiff initiated, Plaintiff also reports having a conversation with her supervisor, Mr. Zambelli, in his office, but she does not remember exactly what she said in the conversation (King Depo. Vol. I, 152:5-8; 152:23-24).  Plaintiff states that Mr. Zambelli told Plaintiff that she would need to be available 24/7 and go to the office if needed. (King Depo. Vol. I, 152:9-19).  Plaintiff believes that during the meeting, Mr. Zambelli was seated and she has no recollection regarding whether he was calm or upset; nor what his tone of voice was like, or whether he made any facial expressions.  (King Depo. Vol. I, 153:1-12).  Plaintiff does not recall any topic for which he said she would need to be available, but Plaintiff believes the one statement she does recall, regarding availability, was threatening.  (King Depo. Vol. I, 153:13-19).

On Day 1 of her deposition, Plaintiff testified that õImmediately followingö her conversation with Mr. Zambelli, she spoke to Matt Brown in Human Resources and Brown said did not need to be on call.  (King Depo. Vol. I, 34:2-10).  At Day 2 of her deposition, Plaintiff testified differently stating that Plaintiff also spoke with Diana Jay, the administrative assistant to the CFO, showing her the email exchange with Ms. Moriarty, and Plaintiff told Ms. Jay, õIøm going to call Matt [Brown].ö  Plaintiff closed the door to call Brown right away because Ms. Jay stated that he sometimes leaves early.  (King Depo. Vol. II, 65:14-66:6).  Ms. Jay õpossiblyö told Plaintiff that if she spoke with HR, it all would be okay. (King Depo. Vol. II, 66:14-18). Plaintiff emailed Brown, Human Resources, by 1:39 p.m. (King Depo. Vol. II, 77:7-15), communicated via email and spoke to Brown before the end of the day. (King Depo. Vol. II, 77:7-22. Ex. 24).   Brown assured her no one would contact her and no one contacted Plaintiff while she was out on medical leave. (King Depo. Vol. II, 34:11-15).

***Plaintiff's Evidence Regarding Hostile Work Environment on her Return***

Plaintiff presented evidence regarding her ability to perform her job functions including:

- From April 21, 2014 to June 2, 2014, Plaintiff experienced no ridicule, discriminatory intimidation or insults (King Depo. Vol. I, 34:22 ó 35:9; Vol. II, 34:16-22);

- Upon her return from leave, Plaintiff has no recollection of any harassment which she believes is based upon a medical condition.  (King Depo. Vol. I, 150:11-21).  She has no recollection of anything Moriarty did that was harassing because of medical condition after she returned from leave. (King Depo. Vol. I, 150:11-21).

- She felt threatened when Ms. Moriarty looked at her, from the other side of the building, separated by two partitions and a couple of conference room tables; and,

- When Plaintiff returned from FMLA, she was busy getting her work done and checking to make sure everything was lined up and was only getting up to use the ladiesø room or to heat up food. (King, Depo. Vol. II, 40:20-41:2).

Throughout her employment, there were two matters Plaintiff found to be threatening.  The first was the four-hour span of April 21st and the second was Ms. Moriarty õconstantlyö looking in õto see if [Plaintiff] was in her officeö following her return from leave.(King Depo. Vol. II, 31:11 ó 24). But Plaintiff does not believe she was subject to the alleged threats õbecause ofö her medical condition.

### *Plaintiff Presents No Evidence Regarding Causation/Intent*

Plaintiff admitted that she is merely assuming that somebody had a discriminatory intention. (King Depo. Vol. II, 37:4 -38:3).  Plaintiff does not know who was motived to eliminate her position because of a disability. (King Depo. Vol. II, 36:1-8). She does not have a belief about who made the decision to eliminate the position and when asked who does she suspect made the decision, she did not know. (King Depo. Vol. II, 36:21-37:4). When asked who she thinks is the person who *would* discriminate because of a disability, she did not know.  (King Depo. Vol. II, 37:5-9).

Plaintiff has no recollection of anyone at Mestek ever making a statement or comment in any way that was negative about a disability. (King Depo. Vol. II, 36:9-14). She cannot recall any statement or comment about medical leave or disability that was negative.  (King Depo. Vol. II, 36:15-20).

Plaintiff believes the company terminated her because of a disability simply õbecause [she] had asked for leave in order to care [for her] condition and to be able to stop it from spreading.ö (King Depo. Vol. II, 35:17-24).

All of the information Plaintiff has regarding discriminatory animus or retaliation is located in the Complaint, the Amended Complaint, the MCAD charge and Plaintifføs responses to the interrogatories. (King Depo. Vol. I, 148:12-150:2).  When the õPlaintiff perused documentsö on a question of harassment and discrimination by Moriarty, the Plaintiff stated, õI do not see anything in here.ö (looking at her interrogatory responses).  (King Depo. Vol. I, 148:12-151:19).

To the extent the Plaintiff claims individuals would not speak to her upon her return, Plaintiff cannot remember if she spoke to Matovich about what work she performed for Plaintiff; or, if she asked Mr. Zambelli about anything related to her job duties (King Depo. Vol. I, 161:3-6).

Plaintiff <u>does</u> recall that in terms of interacting with people in her workplace, she õintended to lay low and keep to herself because she was trying to not do a lot of walkingö so laying low was õgetting me through my emails and catching myself up; reviewing all my files to see if they were all set.ö Id. at 7-15.

Plaintiff intentionally decided not to interact with people because she was arriving early and doing her work and getting herself caught up to be ready for the following month-end close.  (King Depo. Vol. I, 161:16-21, 172 - 173).  And in response to discovery, Defendant produced numerous emails when people communicated with Plaintiff between May 21 ó June 2, 2014.

Ultimately Plaintiff confirmed that she has absolutely no examples of harassing conduct beyond what was listed in her response to Defendantøs Interrogatories.  (King Depo. Vol. I, 169:8-11).

When asked for the basis of her retaliation claim, she said õbecause I had made HR aware that I felt I was being harassed prior to going out on medical leaveö ó but later admitted she did not use the word õharassed.ö  She told Matt Brown it õfelt like my job was in jeopardy taking a medical leave based off of the comments and emails that were being sent the day before.ö (King Depo. Vol II, 42 ó 44:1; 45:17 ó 46:6).  Plaintiff believes she was separated from employment because of the conversation she

had with Matt Brown on the question of whether or not she needed to respond to work during her FMLA leave. (King Depo. Vol. II, 44: 2-8).

Asked if she believes she was retaliated against for taking FMLA leave. Plaintiff responded, õI believe I was retaliated against, I believe, from my last testimony, I have answered this numerous times, that I was retaliated against for reporting that I was having ó people were telling me that I needed to be available, and I was getting emails from people stating that I was not doing my job.ö  Another time, Plaintiff testified that the õpeopleö are Mr. Zambelli and Ms. Moriarty.  (King Depo. Vol. II, 44:9-24). The only other factor relating to her claim for retaliation is that she was let go õbecause I requested leave.ö  (King Depo. Vol. II, 46:14).

## II.   ARGUMENT

### A.   Standard

Summary judgment is warranted when the evidence produced in a case shows that õthere is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.ö *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Summary judgment is a device that õhas proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways.ö *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). The object of summary judgment is õto pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.ö *Dávila v. Corporación De Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 12 (1st Cir.2007), (citations omitted).  An issue is genuine if õa reasonable jury could resolve the point in favor of the nonmoving party.ö *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000).  A fact is material if it has the potential to determine the outcome of the litigation. *See Calvi v. Knox County,* 470 F.3d 422, 426 (1st Cir.2006). Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case õis ... not significantly probative,

summary judgment may be granted." *Acosta,* 386 F.3d at 8 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**B.**     **Summary Judgment of Defendant on COUNTS I and III (Discrimination Based on Real or Perceived Disability in Violation of State and Federal Law) SHOULD ENTER BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT**

To recover for disability discrimination under the Americans with Disabilities Act ("ADA"), a plaintiff must show that (1) she suffers from a disability within the meaning of that statute; (2) she was, nevertheless, qualified for the job; and (3) she was discharged, in whole or in part, because of her disability. *See Lessard v. Osram Sylvania, Inc.*, 175 F.3d 193, 197 (1st Cir. 1999). "Disability" has three statutory definitions: "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)).

For an ADA plaintiff to be "regarded as" disabled she must show that defendant mistakenly believed that plaintiff: (1) has a limiting impairment that plaintiff does not have, or that (2) plaintiff's actual, non-limiting impairment, limits one or more major life activities. *See Roman–Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 49 (1st Cir. 2011). A plaintiff cannot merely show that defendant perceived her as "somehow disabled" but must prove that defendant regarded her as "disabled within the meaning of the ADA." *Ruiz Rivera v. Pfizer Pharmaceuticals, LLC*, 521 F.3d 76, 83 (1st Cir. 2008).

**1.**     **There is No Triable Issue Because Plaintiff Presented No Evidence that Defendant Mistakenly Believed that Plaintiff was Disabled**

While the record establishes Plaintiff was observed using crutches (sometimes 2, sometimes 1, often none), Plaintiff presented no evidence that Defendant regarded her as disabled within the meaning of the ADA. Even when offered the opportunity to speculate, Plaintiff instead established the absence of evidence regarding the elements she is obligated to present. Plaintiff was asked: "What employees at Mestek perceived you as disabled?" and she replied, "I don't know their perception of me." (King Depo. Vol 1, 177:3-7).

**2.**     **There is No Triable Issue With Respect to Plaintiff's   Claim that She Suffered Disability Discrimination**

Returning to the legal standard articulated in the previous paragraphs, unlawful discrimination may be proven by direct or circumstantial evidence. *Blare v. Husky Injection Molding Sys. Boston*, 419 Mass. 437, 445 n. 8 (Mass. 1995); see also *Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64 (1st Cir. 2002).* Where Plaintiff has no direct evidence in this case, she can only prevail by presenting sufficient circumstantial evidence of animus based on her protected class status.

Again, to survive summary judgment, "plaintiff bears the initial burden of establishing a *prima* facie case of discrimination." Under the *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)* burden shifting. However, Plaintiff cannot establish she satisfied the 3rd prong because she lacks proof that Mestek took an adverse employment action against her because of, in whole or in part, her protected disability. *DiBlasi v. Libery Mutual Group, Inc*., (Dist. MA, Stearns) 2014 WL 1331056, 49 NDLR P 41, *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 104 (1st Cir.2005). Moreover, even if Plaintiff could satisfy the third prong, the burden of production shifts to the Defendant to *articulate* (not prove) a legitimate, non-discriminatory reason for its decision. *McDonnell Douglas, 411 U.S. at 802.* Whereupon, the burden shifts back to the plaintiff to *prove* by a preponderance of the evidence that the defendant's proffered, non-discriminatory reason is a pretext for unlawful discrimination. *Id.*

### a. *Plaintiff has no evidence from which even an inference of animus could be inferred or argued and therefore, she cannot meet her burden of establishing a prima facie case.*

Plaintiff presents no evidence that the Defendant knew the Plaintiff suffered from a disability. *DiBlasi v. Libery Mutual Group, Inc*., (Dist. MA, Stearns) 2014 WL 1331056, 49 NDLR P 41. She does not present any testimony or documents even creating an inference that the Defendant knew the Plaintiff to be disabled at the time it decided to eliminate the Plaintiff's position.

õAt the most basic level, it is intuitively clear when viewing the ADAøs language ... that an employer cannot fire an employee ÷because of ÷a disability unless it knows of the disability.ö *DiBlasi*, citing, *Hedberg v. Indiana Bell Tel. Co., Inc.,* 47 F.3d 928, 932 (7th Cir.1995). *See Morisky v. Broward Cnty.,* 80 F.3d 445, 448 (11th Cir.1996) (õVague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA.ö); *Sever v. Henderson,* 381 F.Supp.2d 405, 418 (M.D.Pa.2005) (õ[S]imply informing an employer of a particular

20

condition is not tantamount to providing the employer with knowledge that the employee is substantially limited in some major life activity.ö); *Lewis v. Zilog,* Inc., 908 F.Supp. 931, 950 (N.D.Ga.1995) (holding that, even if the employer was on notice that the plaintiff õhad some type of stress-related medical condition[,][t]hat alone is not sufficient to give notice of a covered disability for purposes of an ADA claimö) (internal citation omitted); *McIntyre v. Kroger Co.,* 863 F.Supp. 355, 359 (N.D.Tex.1994) (holding that the plaintifføs doctorøs note and request for leave did not put his employer on notice that he had a disability).  Plaintiff did not show that Defendant knew of her disability.[4]

Therefore, Plaintiff cannot satisfy the *prima facie* burden of establishing she was fired õbecause ofö a disability where she fails to establish the Defendant õknew of the disabilityö and Defendant is entitled to Summary Judgment on Counts I and V.

Even if we assume for the sake of argument only, that õbeing outö for two weeks is proof of a disability, the first stage of the analysis still requires Plaintiff to present even circumstantial evidence of animus from which a reasonable inference could be drawn.  It is undisputed, Plaintiff presents no evidence of a discriminatory animus based on disability or handicap.  To the contrary, from the date of hire to the day before going on leave, Plaintiff confirms repeatedly she has not a scintilla of evidence of discriminatory animus.  In fact, the evidence presented proves there was no discriminatory animus. The same person who made the hiring decision was involved in the termination decision. No person made any statements or engaged in any behavior which even suggests a discriminatory intention.  The general response from the Plaintiff is that she knows of no person at Mestek who would engage in disability discrimination and where she wishes to speculate about certain people, her testimony undercuts such speculation by confirming she has no evidence of their discriminatory intentions.

Essentially, the Plaintiff attempts to ground her case merely on the fact that she had a condition and needed a couple weeks off in order to care for herself; this requires one to assume that in the span of less than half a day, the Defendant employees transformed from never once displaying any indicia of

---

[4] The evidence presented establishes people knew she had stubbed her toe, had õfoot problemsö, took a week off for bleeding related to a õwomenøs problem,ö was out for of work related to a procedure, had an ingrown toenail, etc.  But just like in *DiBlasi*, the Plaintiff in the present case does not present evidence demonstrating the Defendant knew of the Plaintifføs disability.

discriminatory animus, into individuals engaged in intentional and unlawful acts.  The improbability that the supervisory attitude transformed in a short period of time cuts against a finding Plaintiff has met her burden of establishing of discriminatory animus. *Bulwer v. Mount Auburn Hosp.*, 86 Mass. App. Ct. 316, 351, 16 N.E.3d 1090, 1117 (2014), aff'd in part, 473 Mass. 672, 46 N.E.3d 24 (2016),  *Dziamba v. Warner & Stackpole LLP,* 56 Mass.App.Ct. 397, 406, 778 N.E.2d 927 (2002).

### b.      *Defendant Mestek has articulated its legitimate, non-discriminatory reasons for eliminating Plaintiff's position.*

Roughly nine months after Plaintiff was hired into the at-will position of "Assistant" Controller, the actual controller retired.  Thereafter, the Plaintiff was an assistant to a vacancy and Defendant did nothing to fill the position.  Moreover, it is undisputed that from March of 2013 into early 2014 the Defendant was analyzing and restructuring the Finance Department.  The elimination of the Plaintiff's position was part of that process.  The process was delayed and compounded by notice of a second retirement and a death.

Within that restructuring process and analysis, Plaintiff was offered the cost manager position, which she refused because it was contrary to the career path she sought and she did not want to "go back" to a cost position.  Thereafter, Plaintiff was assigned a supervisor and the evidence demonstrates she swiftly was advised verbally and in writing that her performance did not meet the acceptable professional standard or otherwise add value to the team.

The evidence further demonstrates that prior to providing Plaintiff with the written notice, Plaintiff's supervisor decided on Oct. 17, 2013, that he did not want to continue Plaintiff in her current employment because management did not believe she was performing well.

Testimony consistently establishes that the decision to eliminate the Plaintiff's position was made before she asserted a need for a brief medical leave; but the position elimination had not been communicated to Plaintiff.   The record explains the timing in terms of communication the restructuring decision and the obligations of the Department.

22

The Assistant Controller position was never filled because the duties of the position were redistributed including to an employee with equal credentials more seniority and superior knowledge.

The analysis related to restructuring ensued nearly one year prior to Plaintiff's request for leave and the decisions had been finalized prior to her request.  Although the Defendant was under no obligation to delay the implementation of the position elimination in order to allow Plaintiff to take her leave, the fact that it did does not convert this situation into a violation of law.

Mestek met Defendant's burden of production in an employment discrimination action to articulate a legitimate, nondiscriminatory reason for its decision.  "The reasons given for a decision may be unsound or even absurd, and the action may appear arbitrary or unwise, nonetheless the defendant has fulfilled its obligation, and the defendant is not required to persuade the fact finder that it was correct in its belief." *Bulwer v. Mount Auburn Hosp.,* 86 Mass. App. Ct. 316, 16 N.E.3d 1090 (2014), aff'd in part, 473 Mass. 672, 46 N.E.3d 24 (2016)

### c.       Plaintiff Presents No Evidence that the Legitimate Business Reason for the Elimination of Plaintiff's Position Was a Pretext.

Whether the defendant's proffered reason is a pretext; that is, "[d]oes the employer's articulated reason ‑lack[ ] reasonable support in evidence or is [it] wholly disbelievable[?]" *Brooks v. Peabody & Arnold, LLP*, 71 Mass. App. Ct. 46, 52, 878 N.E.2d 572, 577 (2008), *Lewis v. Area II Homecare for Senior Citizens, Inc.,* 397 Mass. 761, 765, 493 N.E.2d 867 (1986).

"Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions." *Pina v. Children's Place*, 740 F.3d 785, 798 (1st Cir. 2014), citing *Mesnick,* 950 F.2d at 825.  Because there is nothing in the record suggesting the restructuring or assessment of Plaintiff's employment was discriminatory, there is no basis for a finding of pretext. *Id.*

Plaintiff has not shown "weaknesses, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the

employer did not act for the asserted non-discriminatory reasonsö and has not shown pretext.  *Straughn,* 250 F.3d at 42 (internal quotation marks omitted).

Even a temporal proximity argument cannot prevail in the instant case.   The undisputed testimony is that the restructuring process ensued in 2013, a year before Plaintifføs request for leave, and was completed prior to Plaintiff providing notice of an intention to take a medical leave.  Plaintiff knows the analysis was on-going because at least six months prior to her request for leave, she was offered lesser position as part of the restructuring process.

It is impermissible to õdraw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.ö *Cabán Hernández v. Philip Morris USA, Inc.,* 486 F.3d 1, 8 (1st Cir.2007).  A party cannot successfully oppose a motion for summary judgment by resting õupon mere allegations or denials of his pleading,ö *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993) (internal quotation marks omitted).  Where, as here, the nonmovant bears the ultimate burden of proof on a given issue, she must present õdefinite, competent evidenceö sufficient to establish the elements of her claim in order to survive a motion for summary judgment. *Mesnick,* 950 F.2d at 822. This is no less true in discrimination and retaliation cases where motive is at issue; a nonmovant cannot rely õmerely upon conclusory allegations, improbable inferences, and unsupported speculation.ö *Dennis,* 549 F.3d at 855ö56 (internal quotation marks omitted); *Hoeppner v. Crotched Mountain Rehab. Ctr., Inc.,* 31 F.3d 9, 14 (1st Cir.1994). See, *Pina v. Children's Place*, 740 F.3d 785, 795ö96 (1st Cir. 2014); *Feliciano De La Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 5 (1st Cir.2000). õUnsupported allegations and speculation do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment.ö *Rivera–Colon v. Mills.* 635 F.3d 9, 12 (1st Cir.2011); *see Serra v. Quantum Servicing, Corp.,* 747 F.3d 37, 39ö40 (1st Cir.2014) (õallegations of a merely speculative or conclusory nature are rightly disregardedö).

In the instant action, Plaintiff provides no definite and competent evidence which would be sufficient to establish her claim and she fails to shoulder õ-The burden of producing specific facts

sufficient to deflect the swing of the summary judgment scythe.ø ö *Noviello,* 398 F.3d at 84, citing *Mulvihill v. Top–Flite Golf Co.,* 335 F.3d 15, 19 (1st Cir.2003).

When a plaintiff only makes a weak showing <u>and</u> there is õabundant and uncontroverted independent evidence that no discrimination had occurred,ö the employer is entitled to judgment as a matter of law. *Reeves v. Sanderson Plumbing Products. Inc.,* 530 U.S. at 148. A õslight suggestion of pretext ...,ö absent other evidence from which discrimination can be inferred,ö does not meet a plaintiff's ultimate burden and warrants summary judgment in favor of the employer. *Gordon v. Massachusetts Bay Transp. Auth.*, No. CIVA11-101103-GAO, 2014 WL 5885149, at *25 (D. Mass. Oct. 28, 2014), <u>report and recommendation adopted in part, rejected in part,</u> No. CIV.A. 11-10103-GAO, 2014 WL 5464093 (D. Mass. Oct. 28, 2014); *Zapata–Matos v. Reckitt & Colman, Inc.,* 277 F.3d 40, 47 (1st Cir.2002) (citing and relying on *Reeves,* 530 U .S. at 148); *see also Kosereis v. Rhode Island,* 331 F.3d 207, 215ö216 (1st Cir.2003).

In the present case, Plaintiff <u>admits</u> that she has nothing more that assumption and speculation on which she attempts to satisfy her burden of proving discriminatory animus and pretext.  Accordingly, there is no issue to present to the trier and Defendant is entitled to Summary Judgment.

**C.**     **<u>Summary Judgment of Defendant on COUNTS II AND VIII (Hostile Work Environment Disability Harassment) SHOULD ENTER BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT</u>**

To prevail on a claim of disability harassment, pursuant to the ADA, the Plaintiff must establish that: (1) she is disabled within the meaning of the ADA; (2) she was subjected to unwelcome harassment;  (3) that the harassment was based upon her disability; (4) that the harassment was severe or pervasive enough to alter the conditions of her employment and create a hostile work environment; (5) that the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it abusive and the victim in fact did perceive it to be so, and (6) that some basis for employer liability has been established.  *Whitlock v. Mac-Gray, Inc.*, No. CIV.A. 00-10546-GAO, 2002 WL 31432688, at *3 (D. Mass. Oct. 30, 2002) *aff'd*, 345 F.3d 44 (1st Cir. 2003) (citing *O'Rourke v. City*

25

*of Providence,* 235 F.3d 713, 728 (1st Cir. 2001); *Ward v. Mass. Health Research Inst.,* 48 F.Supp.2d 72, 80 (D.Mass.1999), *rev'd on other grounds,* 209 F.3d 29 (1st Cir.2000)).

To establish a hostile work environment, a plaintiff <u>must</u> show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . her employment and create an abusive working environment." *Quiles-Quiles v. Henderson,* 439 F.3d 1, 7 (1st Cir. 2006) (alterations in original) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)) (internal quotation marks omitted).

Additionally, the Supreme Court has emphasized that the federal employment discrimination laws do not establish "a general civility code" for the workplace. *Oncale,* 523 U.S. at 81. Rather, an employee claiming harassment must demonstrate that the hostile conduct was directed at her ***because of*** a characteristic protected by a federal anti-discrimination statute. [emphasis added]. *See id.* at 80; *Lee-Crespo v. Schering-Plough Del Caribe, Inc.,* 354 F.3d 34, 43 n.5 (1st Cir. 2003).

Plaintiff's testimony established she has no evidence of hostile work environment harassment.

### 1.    <u>COUNT VIII 151B: Handicap Harassment</u>

Similarly to federal law, claims for hostile work environment harassment under Chapter 151B may require a Plaintiff to show that the "conduct alleged was sufficiently severe and pervasive to interfere with a reasonable person's work performance." *Cook v. Entergy Nuclear Operations, Inc.*, 948 F. Supp. 2d 40, 43 (D. Mass. 2013) (citing *Muzzy v. Cahillane Motors, Inc.,* 434 Mass. 409, 411, 749 N.E.2d 691 (2001). However,  it is unclear whether Massachusetts law recognizes a claim for a hostile work environment based on handicap. *See Barton v. Clancy*, 632 F.3d 9, 20 (1st Cir. 2011) (noting that "the SJC has not specifically confirmed that Massachusetts recognizes a claim for a hostile work environment based on handicap under ch. 151B, § 4(16)"); *Lukacinsky v. Panasonic Serv. Co.*, No. CIV.A.401410FDS, 2004 WL 2915347, at *19 (D. Mass. Nov. 29, 2004). ("Although the issue is not free from doubt, Massachusetts apparently recognizes a claim for hostile work environment for handicap discrimination under Mass. Gen. Laws ch. 151B, § 4(16).")

26

Under Massachusetts law, a hostile work environment is one that is õ "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace." ö *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 177ó78 (1st Cir. 2008), *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 750 N.E.2d 928, 937 (2001) (quoting *College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination,* 400 Mass. 156, 508 N.E.2d 587, 591 (1987)).

The environment must be sufficiently hostile or abusive in light of <u>all</u> of the circumstances, including the õfrequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.ö *Faragher,* 524 U.S. at 787-88, 118 S.Ct. 2275 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

**Plaintiff cannot show, and does not even allege,** that her workplace was õpermeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . her employment and create an abusive working environment.ö *Quiles-Quiles v. Henderson,* 439 F.3d 1, 7 (1st Cir. 2006) (alterations in original) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)) (internal quotation marks omitted).

Plaintiff asserts that <u>from the date of hire to April 20, 2013</u>, she never experienced, ridicule, insult, abuse, intimidation, humiliation, etc.   Because she suffered no such conduct, the court cannot submit the claim to the trier.

In the 23 months of Plaintifføs employment, there is a portion of one day during which Plaintiff asserts she suffered harassment; and, during the portion of that one day, the duration of the alleged harassment is no greater than an õisolated incidentö which is not covered by law.

In addition, not only does Plaintiff fail to establish she suffered harassment, Plaintiff fails to establish that the isolated incident was õbased on her disability.ö   There was one email about her job. No objectively reasonable review could find that the four-line email contained severe and pervasive insult, intimidation and ridicule sufficiently severe or pervasive to alter the conditions of her

27

employment and create an abusive working environment when it merely used terms regarding her professional obligations within the appropriate context.

The other event falling within the four hour period and which Plaintiff subjectively perceives, albeit unreasonably, as intimidating was a conversation she says she initiated with her supervisor regarding her failure to perform her job duties.  Although Plaintiff cannot recall many details about the meeting, including what she said or the demeanor of the supervisor, Plaintiff asserts the supervisor asserted she had an obligation to the Finance Department while she was out on leave.

No objective person would conclude that the alleged discussion was so insulting, intimidating or filled with ridicule, that it meets the element Plaintiff is required to prove.  Even the Plaintiff did not assert that the email and meeting occurring on April 21, 2014 were based on or motivated by her disability.  Plaintiff confirmed under oath there was no harassment based on disability (or any other protected category) of any form or nature.

There is no genuine issue of material fact to submit to the trier.  While the Plaintiff asserted words such as intimidated or threatened by the isolated incident, the Plaintiff also confirmed that she never felt she had been abused.  Accordingly, both the subjective and the objective standards cannot be met and Defendant is entitled to judgment as a matter of law.

**D.      Summary Judgment of Defendant on COUNTS IV, VII, and X (Retaliation based on ADA, c. 151B and FMLA) SHOULD ENTER BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT**

õTo make out a prima facie case of [FMLA] retaliation, an employee must show that: (1)[s]he availed [her]self of a protected right under the FMLA, (2)[s]he was adversely affected by an employment decision, and (3) there was a ÷but-forø causal connection between the protected conduct and the adverse employment action.ö *Pagan–Colon v. Walgreens of San Patricio,* Inc., 697 F.3d 1, 9 (1st Cir.2012), as modified by *Univ. of Texas S.W. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). If Plaintiff carries her weight, the burden shifts to the defendant to articulate a õlegitimate reasonö for the adverse employment decision. *Id.* at 9, quoting *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 160 (1st Cir.1998). This burden is simply one of productionô if met (as it is in most cases),

28

then it falls to the Plaintiff to show that the reasons offered by the Defendant are a pretext ginned up to disguise a retaliatory motive. *See DiBlasi,* supra.

M.G.L. Chapter 151B, §4(4) prohibits any person or employer from taking adverse action against a person "because he [or she] has opposed any practices forbidden under [chapter 151B] or because he [or she] has filed a complaint, testified or assisted in any proceeding under [chapter 151B]."129 In order to prove retaliation, a complainant must show that: (A) she engaged in protected activity; (B) her employer knew of this protected activity and acted adversely against her; and (C) a causal nexus exists between the adverse action and the protected activity.  In order to prove protected activity, a complainant must demonstrate that she "reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination and that [s]he acted reasonably in response to [her] belief. *Abramian v. President and Fellows of Harvard College*, 432 Mass. 107, 121 (2000).

Plaintiff asserts a belief that she was retaliated against either because she exercised a right or because on April 21, 2014, she spoke with Tim Zambelli and/or Matt Brown.   Whether analyzing the causation element under the FMLA or the other statues,   Plaintiff's only claimed evidence beyond speculation is "Temporal Proximity" which (a) is erroneous; and (b) even if true, is insufficient to submit the instant matter to the jury. Plaintiff's effort to focus on the time that passed between when the leave was taken, and when the previously-made decision was terminated, fails. Plaintiff offers absolutely no evidence of retaliatory intent or evidence of pretext.

The request for FMLA leave was made on March 24, 2014 and leave ensued on April 22, 2014. However, the decision to eliminate Plaintiff's position was made prior to March 24th.

No reasonable jury could conclude that the employer decided to terminate the plaintiff because of her protected activity.  *Moreta v. First Transit of PR, Inc.*, 39 F. Supp. 3d 169, 181 (D.P.R. 2014) (granting summary judgment because "while his filing of the [anti-discrimination] complaint may have factored into [the employer's] decision making process, given the paucity of evidence regarding retaliatory intent, no reasonable jury could conclude that [the employer] decided to terminate [the plaintiff] 'because of' his protected activity").

29

It is well settled that an employer is not precluded from taking previously considered action because an employee later engages in protected activity. *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 519 (1st Cir. 2009), *Clark County School District v. Breeden,* 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam). "If an employer has set a course of action regarding employee [action], it need not change that course of action because a Title VII claim has been made against it." *Ianetta v. Putnam Invs., Inc.,* 142 F.Supp.2d 131, 2002 U.S. Dist. LEXIS 3277, at *35 (D.Mass. Feb. 25, 2002). *See also Prader v. Leading Edge Products, Inc.,* 39 Mass.App.Ct. 616, 617 (1996) (plaintiff failed to meet her burden of showing causal link because "[t]he defendant's reason for firing the plaintiff was buttressed by a written performance evaluation by the plaintiff's immediate supervisor some months prior to [the protected conduct] which, although in general favorable to the plaintiff, stated that the plaintiff needed improvement in ... attitude, tact, communication and courtesy"); *Ianetta v. Putnam Investments, Inc.,* 183 F.Supp.2d 415, 425 (D.Mass.2002) (Chapter 151B) (plaintiff's only evidence of retaliation was that termination occurred one month after he engaged in protected activity, and it was undisputed that a number of his performance problems occurred prior to that activity; under these circumstances, the suggestion of retaliation created by temporal proximity is insufficient to defeat summary judgment); *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001) (Title VII) (observing that employers need not suspend previously planned employment action upon discovering that the employee has engaged in protected activity; "proceeding along lines previously contemplated, though not definitively determined, is no evidence whatever of causality"); *Hoeppner v. Crotched Mountain Rehabilitation Center, Inc.,* 31 F.3d 9, 12, 14-16 (1st Cir.1994) (discharge within days of protected activity, and there had been complaints about employee and she had been placed on probation prior to the activity; insufficient evidence that discharge was causally related to protected conduct).

Statutes that bar retaliation for exercising rights guaranteed by law "do ‑not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers.' " *Marcinuk v. Lew*, No. 13-CV-12722, 2016

30

WL 111409, at *5 (D. Mass. Jan. 11, 2016), *Mesnick*, 950 F.2d at 828-29 (quoting *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1287 at 1391 (8th Cir. 1988)).

In the present case, õThere is only speculation. That is not enough to defeat a motion for summary judgment.ö *Adamson v. Walgreens Co.,* 750 F.3d 73, 83 (1st Cir. 2014); See, e.g., *Brooks v. Peabody & Arnold, LLP,* 71 Mass.App.Ct. 46, 56 (2008).

To survive summary judgment, a plaintiff must provide evidence raising a genuine issue of material fact as to whether the defendant's legitimate, non-retaliatory reason was a pretext for retaliation. At this point of the analysis, the presumption of retaliation no longer exists. <u>*Wagner v. Baystate Health, Inc.,*</u> No. 12-CV-30146-MAP, 2013 WL 5873295, at *4 (D. Mass. Oct. 29, 2013); *Henry v. United Bank,* 686 F.3d 50, 56 (1st Cir.2012).

The First Circuit has found a temporal connection adequate for the *prima facie* case, but it is <u>inadequate</u> on the final stage of the analysis. *See Henry,* 686 F.3d at 57 (noting that the timing needs to be overwhelmingly suggestive of a retaliatory reason to prove pretext); *Calero–Cerezo,* 355 F.3d at 25ó26.

Because the Defendant has offered an acceptable explanation for the sequence of events, the plaintiff needs to provide some evidence to explain why that explanation is invalid.

For Plaintiff to establish pretext here, she needed to provide evidence that directly or indirectly implied a retaliatory motive. The record reveals no such evidence. Without any basis beyond timing, and because the restructuring and dissatisfaction with Plaintiff occurred before any protected activity, a reasonable jury simply could not find that Defendant's explanation constitutes a pretext for retaliation.

It is well-settled that a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage, *Pina v. Children's Place*, 740 F.3d 785, 801ó02 (1st Cir. 2014), *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), but it is equally clear that judges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment, *Bennett,* 507 F.3d at 31.  Plaintiff only offers conjuncture in support of her retaliation claims.

## III.    CONCLUSION

For the foregoing reasons, the Defendant, Mestek, respectfully seeks Summary Judgment should enter on the remaining counts of Plaintiff's complaint because she has failed to put forth evidence on each element for which she carrier the burden and therefore, there is no genuine issue of material fact for the trier.  The Defendant is entitled to judgment as a matter of law.

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Counsel hereby certifies that she has conferred with Counsel of Record for the Plaintiff, Katie King, Michael O. Shea in a good faith attempt to resolve and narrow the issues presented herein.

Respectfully submitted,

The Defendant,

MESTEK, INC.

By Its Attorney,

*/s/ Meghan B. Sullivan*
Meghan B. Sullivan, Esq.
Federal No.:  635265
SULLIVAN, HAYES & QUINN, LLC
One Monarch Place ó Suite 1200
Springfield, MA 01144-1200
Tel. (413) 736-4538
Fax (413) 731-8206
E-mail:  Meghan.Sullivan@sullivanandhayes.com;

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of February, 2017, I electronically filed the ***Defendant's Memorandum of Law in Support of the its Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following registered participants:

Michael O. Shea, Esq.
Law Office of Michael O. Shea, P.C.
3 Crane Park Drive, Suite 7
Wilbraham, MA  01095
E-mail:  owenshea@aol.com

*/s/ Meghan B. Sullivan*
Meghan B. Sullivan, Esq.

33