UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATIE KING,<br><br>                     Plaintiff<br>v.<br><br>MESTEK, INC.,<br><br>                     Defendant | CIVIL ACTION NO. 3:15-cv-30071-MAP<br><br>Leave to file granted on March 6,<br>2017 to exceed twenty-page limit. |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

## I.   INTRODUCTION

The Plaintiff, Katie King (hereinafter "Plaintiff"), respectfully requests that the Court

deny the *Defendant's Motion for Summary Judgment*, as genuine issues of material fact remain

to be tried.[1]

## II.   RELEVANT AND MATERIAL FACTS

The Plaintiff was employed with Mestek, Inc. ("Mestek," "Defendant," or "Defendant

Company") as an Assistant Controller, beginning in or about the Summer of 2012.  SOFs, ¶ 77.

As the Assistant Controller, the Plaintiff did preparation of reconciliations and analysis of

balance sheet accounts, where she would identify any abnormalities and make any corrections.

SOFs, ¶ 78.  When the Plaintiff started at Mestek, her supervisor was Fran Robertson ("Mr.

Robertson"), who was the Controller.  SOFs, ¶ 79.  Mr. Robertson retired from Mestek, which

was announced by Steve Shea ("Mr. Shea"), the CFO.  SOFs, ¶ 80.  After Mr. Robertson, the

Controller and the Plaintiff's supervisor, retired, the Plaintiff was told by Mr. Shea that the

---

[1] The *Plaintiff's Responses and Additions to Defendant's Local Rule 56.1 Statement of Material Facts* ("SOFs") is
filed herewith and incorporated by reference in this Memorandum. Specific paragraphs of *Plaintiff's Responses and
Additions to Defendant's Local Rule 56.1 Statement of Material Facts* ("SOFs") are referenced by the designation of
"SOFs, ¶ ___."

Plaintiff had nothing to worry about, regarding her position as the Assistant Controller, so the Plaintiff was not concerned that the company did not fill Mr. Robertson's position.  SOFs, ¶ 80. After Mr. Robertson left his employment with Mestek, Tim Zambelli ("Mr. Zambelli"), Accounting Manager, became the Plaintiff's supervisor. SOFs, ¶ 81.  Jeanne Moriarty ("Ms. Moriarty"), HVAC Group Controller, was also in a supervisory position and assigned the Plaintiff tasks. SOFs, ¶ 81.  Ms. Moriarty and Mr. Zambelli reviewed the Plaintiff's job performance.  SOFs, ¶ 81.

In or about September 2012, the Plaintiff suffered an injury to her foot that triggered Complex Regional Pain Syndrome.  SOFs, ¶ 82.  The Plaintiff suffers from Complex Regional Pain Syndrome, which is a condition caused by damage or malfunction of the central and peripheral nervous systems.  SOFs, ¶ 82.  She was diagnosed with this condition by Dr. Vu at Baystate Pain Management.  SOFs, ¶ 82.  This condition caused the Plaintiff chronic pain. SOFs, ¶ 83.  The Plaintiff received injections into her foot, and she was not able to weight bear on her toes for a long period of time.  SOFs, ¶ 83.  This pain was severe and constant, so the Plaintiff had two different medications to manage this pain.  SOFs, ¶ 83.  The chronic pain the Plaintiff experienced from her condition, Complex Regional Pain Syndrome, affected her ability to walk and sleep.  SOFs, ¶ 83.  Due to the chronic pain, the Plaintiff was not able to walk without crutches or the walking boot.  SOFs, ¶ 83.  Even with these, walking was still difficult due to the extreme pain.  SOFs, ¶ 83.  The Plaintiff was unable to sleep at night because any minor contact to her injured foot caused extreme pain, which resulted in interrupted sleep.  SOFs, ¶ 83.  This occurred frequently. SOFs, ¶ 83.  The Plaintiff's Primary Care Physician, Ashley Goes, provided the Plaintiff with crutches a week after she injured her foot by breaking her toe.  SOFs, ¶ 84. After the Plaintiff injured her foot, she started to use crutches in order to have the ability to move

around.  SOFs, ¶ 84.  The Plaintiff used two crutches starting in or about October 2012 for about six months, and then she only used one crutch for an additional approximately two months. SOFs, ¶ 84.  Then, the Plaintiff was able to walk on flat surfaces without any crutches, but continued to use a crutch while walking on the stairs for approximately six more months.  SOFs, ¶ 84.  The Plaintiff also used a walking boot from her doctor, starting in or about November 2012 for about three to four months.  SOFs, ¶ 84.

The Plaintiff requested an accommodation from Mestek, when she asked her supervisor at the time, Mr. Robertson, if she could wear a comfortable shoe on her injured foot and park closer to the building, rather than having to cross the street. SOFs, ¶ 85.  The Plaintiff wore the ski boot to work and later wore sneakers. SOFs, ¶ 85.  In or about July 2013, the Plaintiff had another medical issue, unrelated to her foot, that also required the Plaintiff to take a few days off from work.  SOFs, ¶ 86.

In or about October 2013, Mr. Brown in Human Resources also gave the Plaintiff a sudden, one-day notice that the Plaintiff needed to provide a doctor's note to continue her accommodations, which she had previously not needed to provide. SOFs, ¶ 99. Despite this short notice, the Plaintiff received a medical note from Baystate Pain Management, which she provided to Human Resources.  SOFs, ¶ 99. No one from Human Resources or management ever followed up with the Plaintiff's request for this continued accommodation, regarding whether it was approved or denied.  SOFs, ¶ 99.  Since the stress of this situation caused a flare up of the Plaintiff's pain, she parked in the regular employee parking to avoid the stress. SOFs, ¶ 99.

In or about February 2014, the Plaintiff had a procedure where she had a temporary spinal cord stimulator with needles stitched into her spine, and the wires were hanging outside of her clothes.  SOFs, ¶ 87.  This procedure relieved some of the Plaintiff's pain, so her doctors

suggested that she have a procedure in or about April 2014.  SOFs, ¶ 87.  On or about March 24, 2014, after the Plaintiff was aware that she needed to have this surgery on or about April 22, 2014, she met with her supervisor, Mr. Zambelli, to advise him that she needed to be out of work due to this procedure.  SOFs, ¶ 88.  Mr. Zambelli testified that he was aware the Plaintiff was having surgery to have an electrical device installed to manage the Plaintiff's pain.  SOFs, ¶ 88.  Between March 24, 2014 and April 21, 2014, the Plaintiff met with Mr. Zambelli and Anna Matovich ("Ms. Matovich"), who would take on some of the Plaintiff's job responsibilities.  SOFs, ¶ 89.  Ms. Matovich only had a very limited knowledge of the Plaintiff's job responsibilities, and even after meeting to provide instructions of the work, Ms. Matovich could only assist with a few of the Plaintiff's required tasks.  SOFs, ¶ 89.  Ms. Matovich only did the bare minimum of the tasks, which included some entries.  SOFs, ¶ 89.  Upon the Plaintiff's return, the Plaintiff still needed to process all the account reconciliations.  SOFs, ¶ 89.

On or about April 21, 2014, the Plaintiff's last scheduled day of work prior to her medical leave, the Plaintiff learned for the first time from an email from Lisa Lannon that Ms. Moriarty had an outstanding pending question from about a month earlier. SOFs, ¶ 90.  Since the Plaintiff was about to go on leave, the Plaintiff emailed Ms. Moriarty indicating that the Plaintiff could assist her that day, or she could discuss the question with Ms. Moriarty when the Plaintiff returned.  SOFs, ¶ 90.  In response, Ms. Moriarty sent the Plaintiff a threatening email.  SOFs, ¶ 90.  This email stated the following:

> *"Katie-*
> *It's a shame you waited until today to follow up on this issue. If you are*
> *going to be out for an extended time a well-planned absence would have*
> *included following up on outstanding issues. You are in no position to issue*
> *me an ultimatum regarding your duties that you should have well under*
> *wraps.  This should have been resolved with the January closing.  It looks*
> *like you will have some reconciliation work to do upon your return.*
> *Jeanne"*

4

SOFs, ¶ 90.  The Plaintiff understood Ms. Moriarty's email to be threatening in the sense that

Ms. Moriarty did not approve of the Plaintiff taking a leave.  SOFs, ¶ 91.  Especially

considering, the Plaintiff could not do her job without assistance because management did not

include the Plaintiff in the budget meeting that included the information related to the April 21st

email, so she could only complete this task by working with the individuals included in that

meeting, such as Ms. Moriarty.  SOFs, ¶ 91.

On or about April 21, 2014 after Ms. Moriarty sent the Plaintiff the threatening email, the

Plaintiff went to speak with Mr. Zambelli.  SOFs, ¶ 92.  Mr. Zambelli told the Plaintiff that she

would need to be available 24/7 and that if Mr. Zambelli needed her, then she would be required

to come into the office.  SOFs, ¶ 92.  In response, the Plaintiff explained that she would not be

able to comply with such a request because her reason for being on leave was that she could not

drive and had other restrictions from her doctor.  SOFs, ¶ 92.  The Plaintiff again felt threatened

by this conversation because she wouldn't be able to be available 24/7, feeling as if the company

was failing to accommodate her.  SOFs, ¶ 92.  Mr. Zambelli also admits that he told the Plaintiff

she needed to be available for questions during her leave, which included requiring the Plaintiff

to come into the office as needed.  SOFs, ¶ 92.

The Plaintiff reported this conduct to Matt Brown ("Mr. Brown"), Human Resources

Manager, who said that all communications would go through him.  SOFs, ¶ 93.  However, Mr.

Brown testified that he only reported this information to his supervisor Joanne Berwald ("Ms.

Berwald"), Vice President of Human Resources, but does not know if anyone communicated the

Plaintiff's concerns to Mr. Zambelli or Ms. Moriarty.  SOFs, ¶ 93.

After the Plaintiff's procedure, her doctor advised her that she should not lift, bend or

twist for three months. SOFs, ¶ 95.  When the Plaintiff needed to be out of work for medical

related purposes, she would tell her supervisor, Mr. Zambelli, and ask if she needed to provide a medical note. SOFs, ¶ 96. Mr. Zambelli would respond that she didn't need to worry about bringing in documentation from her medical provider. SOFs, ¶ 96.

The Plaintiff returned to work on or about May 21, 2014, and there was a list of tasks that the Plaintiff needed to complete. SOFs, ¶ 94. The Plaintiff attempted to complete these tasks, but neither Mr. Zambelli nor Ms. Moriarty spoke to the Plaintiff until the date of her termination. SOFs, ¶ 94. When the Plaintiff returned to work, other employees also refused to speak to the Plaintiff. SOFs, ¶ 98. After the Plaintiff returned to work, Ms. Moriarty would continuously look into the Plaintiff office to, what seemed like to the Plaintiff, ensure that the Plaintiff was in her office. SOFs, ¶ 97. Ms. Moriarty would stare into the Plaintiff's office multiple times per day. SOFs, ¶ 97. This made the Plaintiff feel uncomfortable and anxious. SOFs, ¶ 97.

On or about June 2, 2014, the Plaintiff was terminated from her position, supposedly because her position was being eliminated. SOFs, ¶ 100. Ms. Moriarty alleges that the Plaintiff's position was eliminated, which resulted in the Plaintiff's termination. SOFs, ¶ 101. Ms. Moriarty also admits that she provided input into the decision to terminate the Plaintiff, and she recommended that the Plaintiff's position be eliminated because they didn't want people with "idle time" among other reasons. SOFs, ¶ 101. Mr. Zambelli asked for Ms. Moriarty's input into the decision to terminate the Plaintiff, and Mr. Zambelli also played a role in this decision. SOFs, ¶ 101. Mr. Zambelli testified that he, Ms. Moriarty, and Mr. Shea made the decision to terminate the Plaintiff with Mr. Shea being less involved. SOFs, ¶ 102. Mr. Zambelli indicated that he did not know exactly when they made the decision to terminate the Plaintiff, but it was sometime between two months prior to the termination and June 2, 2014, which was the date of the actual termination of employment. SOFs, ¶ 102. Ms. Moriarty

witnessed the Plaintiff walking around on crutches, and she was aware that the Plaintiff went on

leave in order to have surgery.  SOFs, ¶ 108.  Mr. Zambelli was also aware of the Plaintiff's

medical issues, including her use of crutches.  SOFs, ¶ 108.   Ms. Berwald indicated that she

cannot recall if any other positions were eliminated around the same time as the Plaintiff's

position was eliminated.  SOFs, ¶ 107.

   Ms. Moriarty testifies that although the Plaintiff made errors in her work, overall, the

Plaintiff was not a bad employee.  SOFs, ¶ 103.  Ms. Moriarty admits herself and other

employees in the Accounting Department have made mistakes.  SOFs, ¶ 103.  The Plaintiff also

did not receive a warning while employed at Mestek.  SOFs, ¶ 103.  Mr. Zambelli testified that

he does not know whether there is a progressive discipline policy at Mestek, but admits that he

has been a supervisor at Mestek for the past twenty of his twenty-five years of employment.

SOFs, ¶ 104.  Mr. Zambelli did not recommend or issue a warning at any point in time during the

Plaintiff's employment, but indicated her position was eliminated because the Plaintiff had "poor

performance."  SOFs, ¶ 104.  Mr. Zambelli also indicated that the Plaintiff was not a bad

employee.  SOFs, ¶ 104.  Mr. Zambelli also never provided the Plaintiff with a performance

evaluation.  SOFs, ¶ 104.

   Anna Matovich ("Ms. Matovich") took over the Plaintiff's job responsibilities after the

Plaintiff's position was eliminated, which resulted in a promotion for Ms. Matovich.  SOFs, ¶

105.  Ms. Matovich did not take a medical leave while at Mestek, except a pregnancy leave.

SOFs, ¶ 105.   Ms. Matovich also did not have any kind of handicap.  SOFs, ¶ 105.  Ms.

Matovich also was relocated into the Plaintiff's office after the Plaintiff's position was

"eliminated."  SOFs, ¶ 105.  Since the time that the Plaintiff's job was "eliminated," a new

employee, Amy LaMadeline ("Ms. LaMadeline") was hired in the Accounting Department about

7

two months after the Plaintiff's termination, and Ms. Madeline worked for Mr. Zambelli, who was also previously the Plaintiff's direct supervisor.  SOFs, ¶ 106.  Ms. LaMadeline never went out on medical leave.  SOFs, ¶ 106.  The Plaintiff was qualified for this position.  SOFs, ¶ 106. Mestek also hired Roger Redfield as an internal audit manager after the Plaintiff's position had been eliminated.  SOFs, ¶ 106.

The Plaintiff experienced financial distress after losing her job.  SOFs, ¶ 109.  The Plaintiff also suffered emotional distress in the form of sleepless nights, crying, and unsure of her financial security and career.  SOFs, ¶ 110.  The Plaintiff was also concerned about making sure she had health insurance.  SOFs, ¶ 110.  The Plaintiff's symptoms from her condition flared up based on the stress endured from losing her job.  SOFs, ¶ 110.

## ARGUMENT

### III.   SUMMARY JUDGMENT STANDARD

The First Circuit has urged courts to use restraint in granting summary judgment once a plaintiff has established a *prima facie* case of discrimination and pretext becomes the issue. *Hodgens v. General Dynamics Corporation*, 144 F.3d 151, 167 (1st Cir. 1998)(internal citation omitted). The *Hodgens* court pointed out:

> Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, and because of the difficulty accurately determining whether an employer's motive is legitimate or is a pretext for discrimination, there is reason to be concerned about the possibility that an employer could manipulate its decisions to purge employees it wanted to eliminate.

*Id*.  A "defendant employer moving for summary judgment faces a 'heavy burden' because the question of the existence of the employer's discriminatory motive is fact-intensive and not amenable to resolution without trial." *LaPointe v. UMass Memorial Medical Center*, 2009 WL 2604195, at *3 (citing *Sullivan v. Liberty Mutual Ins. Co.*, 444 Mass. 34, 38 (2005); *Blare v.*

*Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 439 (1995) ("The ultimate question of the defendants' state of mind is elusive and rarely is established by other than circumstantial evidence . . . ."), quoting *Wheelock College v. Mass. Comm'n Against Discrimination*, 371 Mass. 130, 137 (1976).  Only if, after having reviewed the record in the light most favorable to the plaintiff and having drawn all reasonable inferences in the plaintiff's favor, the summary judgment record shows that there is no genuine issue as to any material fact will the moving party be entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  As discussed below, the Plaintiff's evidence raises genuine issues of material fact, so her claims are appropriately left for a jury to decide at trial.  See *Hodgens v. General Dynamics Corporation*, 144 F.3d at 167.

## IV.    THE PLAINTIFF PRESENTS MORE THAN SUFFICIENT EVIDENCE OF DISCRIMINATION BASED UPON REAL OR PERCEIVED HANDICAP DISCRIMINATION UNDER THE ADAA AND CHAPTER 151B.

In order to establish a prima facie case of disability discrimination under the ADAA and Chapter 151B, The Plaintiff must present credible evidence that: (1) she was disabled within the meaning of the statutes; (2) she was qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she was subject to an adverse employment action. *Ruiz Rivera v. Pfizer Pharms.*, LLC, 521 F.3d 76, 82 (1st Cir. 2008).  The *prima facie* case requires only a "'small showing' that is 'not onerous' and is 'easily made.'" *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003) (internal citations omitted).  The Plaintiff has sufficient evidence to establish a prima facie case of disability discrimination under the ADAA and M.G.L.c. 151B, as she suffered from Complex Regional Pain Syndrome, and was perceived to be disabled by the Defendant; the Plaintiff could perform her job with a reasonable accommodation; and can show that she was ultimately terminated from her employment with the Defendant based upon the bias of the Defendant Company had against the Plaintiff due to her disability.

9

A. **The Plaintiff Was A Qualified Disabled Employee.**

The Plaintiff easily meets her burden as to the first prong of the *prima facie* case. As discussed above, the definition of the terms "disability" and "handicap" under the ADAA and Chapter 151B are similarly defined as: (a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment. 42 U.S.C. 42 §12102(1); M.G.L. c. 151B, § 1(17). *See also*, *Faiola v. APCO Graphics, Inc.*, 629 F.3d 43, 47 n. 2 (1st Cir. 2010).  Under Chapter 151B, the Plaintiff must also establish a fourth element—that the Plaintiff's position remained open and the Defendant sought to fill it. *Dartt v. Browning Ferris Industries,* 427 Mass. 1, 3 (1998).  It is important to note that under the ADAA, the effects of an impairment lasting fewer than six months can be substantially limiting within the meaning of the disability. *See* 29 C.F.R. § 1630.2 (j)(1)(ix). The same is true under Chapter 151B. *See Muse v. United Parcel Service, Inc.*, 71 Mass. App. Ct. 1103 (2008)(a physical impairment that is temporary may constitute a handicap under G.L. c. 151B, § 4(16)).

          1.  The Plaintiff suffered from a physical impairment that substantially limited her in her major life activities.

Importantly, the primary focus of cases brought under the ADAA should be "whether covered entities have complied with their obligations and whether the discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." *See e.g. Gil v. Vortex, LLC*, 697 F.Supp.2d 234, 239-240 (D. Mass. 2010)(a plaintiff, in an employment discrimination case, is not required, under the "relaxed disability standard of the [ADAA]" to plead specific facts demonstrating how his physical impairment substantially limited him in his major life activities). Whether an impairment substantially limits an individual in a major life activity is not meant to be a demanding standard, is determined on case-by-case

basis and should be construed broadly in favor of expansive coverage, to the maximum extent permitted by the ADAA. *Id*. at 238-240.

The Plaintiff suffers from Complex Regional Pain Syndrome, which is a condition caused by damage or malfunction of the central and peripheral nervous systems. SOFs, ¶ 82. She was diagnosed with this condition by Dr. Vu at Baystate Pain Management. SOFs, ¶ 82. This condition caused the Plaintiff chronic pain. SOFs, ¶ 83. The Plaintiff received injections into her foot, and she was not able to weight bear on her toes for a long period of time. SOFs, ¶ 83. This pain was severe and constant, so the Plaintiff had two different medications to manage this pain. SOFs, ¶ 83. Due to the chronic pain, the Plaintiff was not able to walk without crutches or the walking boot. SOFs, ¶ 83. Even with these, walking was still difficult due to the extreme pain. SOFs, ¶ 83. The Plaintiff was unable to sleep at night because any minor contact to her injured foot caused extreme pain, which resulted in interrupted sleep. SOFs, ¶ 83. This occurred frequently. SOFs, ¶ 83.

The Plaintiff's Primary Care Physician provided the Plaintiff with crutches a week after she injured her foot by breaking her toe, which triggered the Complex Regional Pain Syndrome. SOFs, ¶ 82, 84. After the Plaintiff injured her foot, she started to use crutches in order to have the ability to move around. SOFs, ¶ 84. The Plaintiff used two crutches starting in or about October 2012 for about six months, and then she only used one crutch for an additional approximately two months. SOFs, ¶ 84. Then, the Plaintiff was able to walk on flat surfaces without any crutches, but continued to use a crutch while walking on the stairs for approximately six more months. SOFs, ¶ 84. The Plaintiff also used a walking boot from her doctor, starting in or about November 2012 for about three to four months. SOFs, ¶ 84. In or about February 2014, the Plaintiff had a procedure where she had a temporary spinal cord stimulator with needles

stitched into her spine.  SOFs, ¶ 87.  This procedure relieved some of the Plaintiff's pain, so her

doctors suggested that she have a more permanent procedure in or about April 2014.  SOFs, ¶ 87.

After the Plaintiff's procedure, her doctor advised her that she should not lift, bend, or twist for

three months. SOFs, ¶ 95.

Limitations on the major life activity of walking as well as standing, sitting and climbing

have been found sufficient to meet the definition of a disability under Chapter 151B and the

ADA following the 2008 amendments. *See*, *e.g.*, *Shedlock v. Dep't of Corr.*, 442 Mass. 844, 852-

854 (2004)(granting of summary judgment in favor of defendant reversed where genuine issues

of material fact as to plaintiff's physical impairments and their effect on his major life activities

of walking and climbing existed); *Mass. Comm'n Against Discrimination v. Roadway Express,

Inc. n/k/a YRC, Inc.*, 2010 WL 3157771, at *15 (MCAD Aug. 2, 2010)(limited range of motion

in knee constitutes a handicap under Chapter 151B where the same impairs ability "to engage in

a number of activities that involve walking, climbing, sitting and kneeling.").

Finally, an individual's impairment need not substantially limit more than one major life

activity in order to satisfy the definition of disability under the ADA. 29 C.F.R. §

1630.2(j)(1)(viii).  *See*, *Rosa v. City of Chicago*, 2014 WL 1715484, at *4 (N.D. Ill. May 1,

2014)(quoting 29 C.F.R. § 1630 (app.) "stating that the 'express purpose[ ]' of the 2009

amendments was '[t]o reject the standards enunciated by the Supreme Court in Toyota that . . . to

be substantially limited in performing a major life activity under the ADA an individual must

have an impairment that prevents or severely restricts the individual from doing activities that are

of central importance to most people's daily lives'").

The Defendant argues that management was not aware of the Plaintiff's disability; so

summary judgment would be appropriate.  However, there is ample evidence that management

12

and co-workers were aware of the Plaintiff's condition.  In *Clark*, summary judgment was denied where the Plaintiff "sufficiently raised a genuine issue as to whether the Defendant was aware of his walking and/or lifting limitations."  *Clark v. Lincare, Inc.*, No. C.A.03-30199-MAP, 2005 WL 1721213, at *8 (D. Mass. July 21, 2005).  Here, management of Defendant Company admitted to their awareness of the Plaintiff's walking limitation.  Mr. Zambelli testified that he was aware the Plaintiff was having surgery to have an electrical device installed to manage the Plaintiff's pain.  SOFs, ¶ 88.  After the Plaintiff injured her foot, she started to use crutches in order to have the ability to move around.  SOFs, ¶ 84.  The Plaintiff used two crutches starting in or about October 2012 for about six months, and then she only used one crutch for an additional approximately two months.  SOFs, ¶ 84.  Then, the Plaintiff was able to walk on flat surfaces without any crutches, but continued to use a crutch while walking on the stairs for approximately six more months.  SOFs, ¶ 84.  The Plaintiff also used a walking boot from her doctor, starting in or about November 2012 for about three to four months.  SOFs, ¶ 84.  Ms. Moriarty witnessed the Plaintiff walking around on crutches, and she was aware that the Plaintiff went on leave in order to have surgery.  SOFs, ¶ 108.  Mr. Zambelli was also aware of the Plaintiff's medical issues, including her use of crutches.  SOFs, ¶ 108.

      2.  The Plaintiff Was Capable of Performing the Essential Functions of Her Job With or Without Reasonable Accommodations.

As to the second prong, the Plaintiff does demonstrate that she was a qualified person able to perform the essential functions of her job with or without reasonable accommodation. The ADAA and Chapter 151B define a qualified disabled person as one who is capable of performing the essential functions of her job, or who would be capable of performing the essential functions of her job, with reasonable accommodations. M.G.L. c. 151B, § 1(16). Indeed, the Plaintiff has established that she did not receive any form of disciplinary action

during her employment and the Plaintiff was able to perform the essential functions of her job

with reasonable accommodations, regarding dress code and parking.

3.   The Plaintiff Suffered An Adverse Employment Action.

The third and final prong of a prima facie case of discrimination under the ADA, requires

the Plaintiff to demonstrate that she was subjected to an adverse employment action. *Ruiz Rivera

v. Pfizer Pharms., LLC*, 521 F.3d 76, 82 (1st Cir. 2008). Clearly, having been terminated from

her employment with the Defendant, the Plaintiff has established the third prong of her prima

facie case of discrimination under the ADAA and Chapter 151B.

4.   The Plaintiff's position remained open and the Defendant replaced her.

Under Chapter 151B, the Plaintiff must also establish a fourth element—that the

Plaintiff's position remained open and the Defendant sought to fill it. *Dartt v. Browning Ferris

Industries,* 427 Mass. 1, 3 (1998).   Between March 24, 2014 and April 21, 2014, the Plaintiff

met with Mr. Zambelli and Ms. Matovich, to discuss the Plaintiff's job responsibilities.  SOFs, ¶

89.  Ms. Matovich only had a very limited knowledge of the Plaintiff's job responsibilities, and

even after meeting to provide instructions of the work, Ms. Matovich could only assist with a

few of the Plaintiff's required tasks.  SOFs, ¶ 89. Ms. Matovich only did the bare minimum of

work, which included some entries.  SOFs, ¶ 89.  Upon the Plaintiff's return, the Plaintiff still

processed all the account reconciliations.  SOFs, ¶ 89.  Ms. Matovich took over the Plaintiff's

responsibilities after the Plaintiff's position was "eliminated," which resulted in a promotion for

Ms. Matovich, and also relocated into the Plaintiff's former office. SOFs, ¶ 105.  Since the time

that the Plaintiff's job was "eliminated," a new employee, Amy LaMadeline, was also hired in

the Accounting Department about two months after the Plaintiff's termination, and Ms. Madeline

worked for Mr. Zambelli, who was also previously the Plaintiff's supervisor.  SOFs, ¶ 106.

14

**B.  The Defendant's Articulated Reason For Its Adverse Action Is Pretextual.**

Having established a prima facie case of discrimination based upon her disability, the burden now shifts to the Defendant to articulate a non-discriminatory reason for its adverse action, whereupon the burden shifts back to the Plaintiff to show that the Defendant's proffered reason masks its true, discriminatory reason for its action. *Straughn v. Delta Airlines, Inc.*, 250 F.3d 23, 33-34 (1st Cir. 2001); *Holland v. BLH Electronics*, 58 Mass. App. Ct. at 681.

The Defendant's articulated reason for its adverse action masks its real reason for terminating the Plaintiff's employment—discrimination based on disability. The Defendant's purported legitimate reason for the Plaintiff's termination is that the Plaintiff's position was eliminated. However, the Plaintiff maintains that she was discriminated against based upon her disability and requests for reasonable accommodations, including her leave under the FMLA.

A supervisor's hostility towards a plaintiff's leave "is clearly probative of pretext." *Lukacinsky v. Panasonic Serv. Co.*, No. CIV.A.401410FDS, 2004 WL 2915347, at *16 (D. Mass. Nov. 29, 2004).  In *Lukacinsky*, the court denied summary judgment where the plaintiff's supervisor questioned the plaintiff's absences that were related to his medical condition, indicating that the plaintiff's job was "on thin ice," considering such hostility as evidence of pretext.  *Id*.  Here, the Plaintiff similarly experienced hostility from her supervisors surrounding her request for a medical leave.

On or about April 21, 2014, the Plaintiff's last scheduled day of work prior to her medical leave, the Plaintiff received a threatening email from a supervisor, Ms. Moriarty. SOFs, ¶ 90, 91. When the Plaintiff went to express her concerns of this email to her direct supervisor, Mr. Zambelli, he also told the Plaintiff that she would need to be available 24/7 and that if Mr. Zambelli needed her, then she would be required to come into the office.  SOFs, ¶ 92.  The

15

Plaintiff again felt threatened by this conversation because she wouldn't be able to be available 24/7, feeling as if the company was failing to accommodate her.  SOFs, ¶ 92.

When the Plaintiff returned to work on or about May 21, 2014, there was a list of tasks that the Plaintiff needed to complete. SOFs, ¶ 94.  The Plaintiff attempted to complete these tasks, but neither Mr. Zambelli nor Ms. Moriarty spoke to the Plaintiff until the date of her termination. SOFs, ¶ 94.  After the Plaintiff returned to work, Ms. Moriarty would continuously look into the Plaintiff office to, what seemed like to the Plaintiff, ensure that the Plaintiff was in her office. SOFs, ¶ 97.  Ms. Moriarty would stare into the Plaintiff's office multiple times per day.  SOFs, ¶ 97.

The Plaintiff may also demonstrate pretext by showing that "discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55 (1st Cir. 2000).  Here, the threatening comments to the Plaintiff as she was initiating her medical leave were by her direct supervisor, Mr. Zambelli, and another supervisor Ms. Moriarty.  Both supervisors testified to making the decision to eliminate the Plaintiff's decision.  SOFs, ¶ 101, 102.  It is undisputed that Ms. Moriarty and Mr. Zambelli, at the very least, provided the recommendation to eliminate the Plaintiff's position.  SOFs, ¶ 101, 102.

Another means of demonstrating pretext is to show that the purported nondiscriminatory reasons for the adverse action is "marred by 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions.'" *Birnbrich v. New England Bus. Serv., Inc.*, No. 013471, 2003 WL 22049454, at *6 (Mass. Super. July 21, 2003) (quoting *City of Salem v. Massachusetts Commission Against Discrimination,* 44 Mass.App.Ct. 627, 642 (1998)).

16

Interestingly, the Defendant spends an inordinate amount of time and energy attempting to discredit the Plaintiff based on alleged poor performance. Yet, the Defendant articulates its supposed legitimate reason for the Plaintiff's termination as the elimination of her position, and proceeds to fill said "eliminated" position shortly after the Plaintiff's termination. Despite this supposed "poor performance", Mr. Zambelli testified that the Plaintiff was not a bad employee, and he did not recommend or issue a warning or performance evaluation at any point in time during the Plaintiff's employment. SOFs, ¶ 104. Ms. Moriarty admits herself and other employees in the Accounting Department have made mistakes. SOFs, ¶ 103. Ms. Moriarty testified that although the Plaintiff made errors in her work, overall, the Plaintiff was not a bad employee. SOFs, ¶ 103.

Even more striking, only approximately two months before "eliminating" the Plaintiff's position, the Plaintiff's supervisors mandated that the Plaintiff come to the office during her leave in order to complete her job duties. SOFs, ¶ 90, 91, 92. These duties apparently could only be performed by the Plaintiff, considering much of the work was left for the Plaintiff upon her return from medical leave. SOFs, ¶ 94. Yet, at the same time the Plaintiff's managers indicated she must come into the office during her leave, they were simultaneously making the decision that this position should be eliminated. SOFs, ¶ 90, 91, 92, 102.

The Defendant Company after "eliminating" the Plaintiff's position proceeded to replace the Plaintiff with Ms. Matovich. Ms. Matovich, who never took a medical leave or any other type of handicap, took over the Plaintiff's job responsibilities after the Plaintiff's position was eliminated, which resulted in a promotion for Ms. Matovich. SOFs, ¶ 105. Ms. Matovich also was relocated into the Plaintiff's office. SOFs, ¶ 105. Since the time that the Plaintiff's job was "eliminated," a new employee, Ms. LaMadeline was hired in the Accounting Department about

two months after the Plaintiff's termination, and Ms. Madeline worked for Mr. Zambelli, who

was also previously the Plaintiff's direct supervisor.  SOFs, ¶ 106.  The Plaintiff was qualified

for this position.  SOFs, ¶ 106.   Ms. LaMadeline also never went out on medical leave.  SOFs, ¶

106.  Mestek also hired Roger Redfield as an internal audit manager after the Plaintiff's position

had been eliminated.  SOFs, ¶ 106.

## V.   THE DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT WHERE THE PLAINTIFF WAS DENIED REASONABLE REQUESTS FOR ACCOMMODATIONS.

"The Supreme Court has deemed 'essential' individualized attention to disability claims.

As we said in *Criado*, '[w]hether [a] request is reasonable turns on the facts of the case.'"

*Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647 (1st Cir. 2000). Where the

Plaintiff's disability did not prohibit her from performing the essential functions of her job with

accommodation, the jury must consider the issue of reasonable accommodation. *See Tate v.

Department of Mental Health*, 419 Mass. 356, 362 (1995). The First Circuit has noted that it is

the employer's burden to show that the requested accommodations were unreasonable. *Ward v.

Mass. Health Research Inst., Inc.*, 209 F.3d 29, 36 (1st Cir. 2000).

Having established that she is a qualified disabled person under the ADAA and Chapter

151B, the Plaintiff must satisfy an additional three elements in order to make out a prima facie

case of denial of reasonable accommodations. The Plaintiff must show that: (1) she requested a

reasonable accommodation; (2) she was refused the requested reasonable accommodation by the

Defendant; and (3) she suffered harm as a result of the Defendant's refusal. *See Alba v. Raytheon

Co.,* 441 Mass. 836, 843 n. 9 (2004); *Smith v. Bell Atl.,* 63 Mass.App.Ct. 702, 711 (2005).

### A.   The Plaintiff Made Reasonable Requests For Accommodations, And The Defendant Not Only Denied The Plaintiff's Requests, But Also Refused To Engage In An Interactive Process With The Plaintiff.

The Plaintiff requested an accommodation from Mestek, when she asked her supervisor at the time, Mr. Robertson, if she could wear a comfortable shoe on her injured foot and park closer to the building, rather than having to cross the street. SOFs, ¶ 85.  The Plaintiff wore the ski boot to work and later wore sneakers. SOFs, ¶ 85.  Although the Defendant Company initially provided the Plaintiff with accommodations under the previous management, the Human Resources department effectively unreasonably revoked the Plaintiff's accommodation without any notice or conversation with the Plaintiff regarding her continued pain. Mr. Brown in Human Resources also gave the Plaintiff a sudden, one-day notice that the Plaintiff needed to provide a doctor's note to continue her accommodations, which she had previously not needed to provide. SOFs, ¶ 99.  Despite this short notice, the Plaintiff received a medical note from Baystate Pain Management, which she provided to Human Resources.  SOFs, ¶ 99.  No one from Human Resources or management ever followed up with the Plaintiff's request for this continued accommodation, regarding whether it was approved or denied.  SOFs, ¶ 99.  Since the stress of this situation caused a flare up of the Plaintiff's pain, she started to park in the regular employee parking to avoid the stress.  SOFs, ¶ 99.  The Plaintiff's medical leave was also a request for an accommodation, and this reasonable request was effectively denied when the Plaintiff was terminated two weeks after returning from her leave.  SOFs, ¶ 100.

## B. The Defendant Never Indicated That The Plaintiff's Requests For Accommodations Were Unreasonable Or Would Impose An Undue Burden On The Defendant.

In the instant matter, the Defendant has failed to demonstrate that the Plaintiff's requests for accommodations and/or alternate requests for accommodations were unreasonable, let alone an undue hardship on the Defendant. As discussed above, the Defendant rejected the Plaintiff's continued reasonable requests of a modified dress code and closer parking.  The Defendant has,

thus, clearly failed to meet its burden in establishing that the accommodations proposed by the

Plaintiff to continue her accommodations would have created an undue hardship on its business.

*Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999).

## VI.   THE DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S DISABILITY HARASSMENT CLAIM.

The Plaintiff "may make out a [handicap] discrimination claim premised on hostile work

environment, if [s]he alleges 'offensive [handicapped]-based conduct that is severe or pervasive

enough to create an objectively hostile or abusive work environment.'" *Bennefield*, 29 Mass.

Rptr. 635, *3 (2012)(quoting *Landrau-Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607,

613 (1st Cir. 2000))(internal citations omitted).

The Plaintiff submits that the treatment of her by the Defendant from the time she

requested time her medical leave until the date of her termination, discussed fully below,

constitutes a hostile or abusive work environment.  Importantly, the First Circuit has stated,

"[t]here is no 'mathematically precise test' for determining when conduct in the workplace

moves beyond the 'merely offensive' and enters the realm of unlawful discrimination." *Marrero*

*v. Goya of Puerto Rico*, 304 F.3d 7, 18-19 (1st Cir. 2002)(quoting *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21 [1993]).  Instead, "the objective severity of harassment should be judged from

the perspective of a reasonable person in the plaintiff's position, considering 'all the

circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)(quoting

*Harris*, 510 U.S. at 23).  Such circumstances "may include the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance," but are

not limited to them, and "no single factor is required." *Harris*, 510 U.S. at 23; *see also*, e.g.,

*Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 81 (1st Cir. 2001)(noting that a hostile environment claim "necessarily entail[s] a fact-specific assessment of all the attendant circumstances").

The Third Circuit noted the difficulty of proving discriminatory animus in modern times because, "[i]t has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior." *Aman v. Cort Furniture Rental Corporation*, 85 F.3d 1074, 1082 (3rd Cir. 1996).

On or about April 21, 2014, the Plaintiff's last scheduled day of work prior to her medical leave, the Plaintiff learned for the first time from an email from Lisa Lannon that Ms. Moriarty had an outstanding pending question from about a month earlier. SOFs, ¶ 90.  Since the Plaintiff was about to go on leave, the Plaintiff emailed Ms. Moriarty indicating that the Plaintiff could assist her that day, or she could discuss the question with Ms. Moriarty when the Plaintiff returned.  SOFs, ¶ 90.  In response, Ms. Moriarty sent the Plaintiff a threatening email.  SOFs, ¶ 90.  This email stated the following:

> "*Katie-*
> *It's a shame you waited until today to follow up on this issue. If you are going to be out for an extended time a well-planned absence would have included following up on outstanding issues. You are in no position to issue me an ultimatum regarding your duties that you should have well under wraps.  This should have been resolved with the January closing.  It looks like you will have some reconciliation work to do upon your return.*
> *Jeane*"

SOFs, ¶ 90.  The Plaintiff understood Ms. Moriarty's email to be threatening in the sense that Ms. Moriarty did not approve of the Plaintiff taking a leave.  SOFs, ¶ 91.

On or about April 21, 2014 after Ms. Moriarty sent the Plaintiff the threatening email, the Plaintiff went to speak with Mr. Zambelli.  SOFs, ¶ 92.  Mr. Zambelli told the Plaintiff that she would need to be available 24/7 and that if Mr. Zambelli needed her, then she would be required to come into the office.  SOFs, ¶ 92.  In response, the Plaintiff explained that she would not be

able to comply with such a request because her reason for being on leave was that she could not drive and had other restrictions from her doctor.  SOFs, ¶ 92.  The Plaintiff again felt threatened by this conversation because she wouldn't be able to be available 24/7, feeling as if the company was failing to accommodate her.  SOFs, ¶ 92.  Mr. Zambelli also admits that he told the Plaintiff she needed to be available for questions during her leave, which included requiring the Plaintiff to come into the office as needed.  SOFs, ¶ 92.  The Plaintiff reported this conduct to Matt Brown ("Mr. Brown"), Human Resources Manager, who said that all communications would go through him.  SOFs, ¶ 93.  However, Mr. Brown testified that he only reported this information to his supervisor Joanne Berwald ("Ms. Berwald"), Vice President of Human Resources, but does not know if anyone communicated the Plaintiff's concerns to Mr. Zambelli or Ms. Moriarty.  SOFs, ¶ 93.

The Plaintiff returned to work on or about May 21, 2014, and there was a list of tasks that the Plaintiff needed to complete.  SOFs, ¶ 94.  The Plaintiff attempted to complete these tasks, but neither Mr. Zambelli nor Ms. Moriarty spoke to the Plaintiff until the date of her termination.  SOFs, ¶ 94.  When the Plaintiff returned to work, there were also other employees that refused to speak to the Plaintiff.  SOFs, ¶ 98.  After the Plaintiff returned to work, Ms. Moriarty would continuously look into the Plaintiff office to, what seemed like to the Plaintiff, ensure that the Plaintiff was in her office. SOFs, ¶ 97.  Ms. Moriarty would stare into the Plaintiff's office multiple times per day.  SOFs, ¶ 97.  Mr. Brown in Human Resources also gave the Plaintiff a sudden, one-day notice that the Plaintiff needed to provide a doctor's note to continue her accommodations, which she had previously not needed to provide.  SOFs, ¶ 99.  Despite this short notice, the Plaintiff received a medical note from Baystate Pain Management, which she provided to Human Resources.  SOFs, ¶ 99.  No one from Human Resources or management

followed up with the Plaintiff's request for this continued accommodation, regarding whether it was approved or denied.  SOFs, ¶ 99.  Since the stress of this situation caused a flare up of the Plaintiff's pain, she parked in the regular employee parking to avoid the stress.  SOFs, ¶ 99.

Given the foregoing, it should be left to a jury to weigh factors such as the frequency and severity of the harassing conduct, and the extent to which it interfered with the Plaintiff's job, and ultimately deciding whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment. *Morrison v. Northern Essex Community College*, 56 Mass. App. Ct. 784, 798 (2002)(quoting *Marrero v. Goya of P.R.*, 304 F.3d 7, 18-19 (1st Cir. 2002)); *Gorski v. N.H. Dep't of Corrections*, 290 F.3d 466, 472-73 (1st Cir. 2002).

## VII.   THE DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFF'S RETALIATION CLAIMS.

To succeed on a retaliation claim, a plaintiff must prove that she engaged in protected activity; she suffered an adverse employment action; and a causal connection exists between the two.  *Mole v. University of Massachusetts*, 58 Mass. App. Ct. 29 (2003).  This causal connection may be established if the alleged retaliatory acts are close in time to the plaintiff's protected activity. *Id*. at 39.  Under this standard, retaliation claims succeed even though the underlying claims of discrimination fail. *See*, *e.g.*, *Zimmerman v. Direct Federal Credit Union*, 262 F.3d 70, 80–85 (1st Cir. 2001).

### A.   The Plaintiff Engaged In Legally Protected Activity When She Requested Accommodations For Her Disability.

As discussed above, the Plaintiff requested reasonable accommodations from the Defendant that were initially approved, and later revoked without notice.  The Plaintiff also requested a leave for her handicap and she was terminated just weeks after returning from her

23

leave after management was obviously upset for her taking a leave.  A request for accommodation is a form of protected activity. *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997).

**B.  The Plaintiff Suffered An Adverse Employment Action.**

As discussed above, the Plaintiff suffered adverse employment actions when she was denied reasonable accommodations, harassed, and her employment was terminated.  An employer's denial of a reasonable accommodation constitutes an adverse employment action in situations, such as here, where the denial is materially adverse to a reasonable employee. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996); *Flaherty v. Gas Research Institute*, 31 F.3d 451, 456 (7th Cir. 1994); *Rivot-Sanchez v. Warner Chilcott Co.*, 707 F. Supp. 2d 234, 272 (D.P.R. 2010).

The Plaintiff was also terminated from her employment only approximately two weeks after returning from her medical leave. "[A]n employer's seeming willingness to accommodate an employee's disability does not conclusively preclude a finding that the employer was motivated by retaliatory intent." *Kelley v. Corr. Med. Services, Inc.*, 707 F.3d 108, 118 (1st Cir. 2013). "[I]t would be 'anomalous' to interpret the ADA as 'leav[ing] employees unprotected if any employer granted the accommodation and shortly thereafter terminated the employee in retaliation.'" *Kelley v. Correctional Medical Services, Inc.*, 707 F.3d 108 (1st Cir. 2013)(internal citation omitted).

**C.  There Is A Causal Connection Between The Protected Activity And The Adverse Action Demonstrating Pretext.**

A causal connection may be established if the retaliatory acts are close in time to a plaintiff's protected activity. *Zimmerman v. Direct Federal Credit Union*, 262 F. 3d 70, 80-85 (1st Cir. 2001); *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998); *Surprise v.*

*The Innovation Group*, 2013 WL 59326 at *12-13 (D.Mass. Feb. 14, 2013). In this case, the protected activity occurred approximately eight weeks after the Plaintiff's requested reasonable accommodations and less than two weeks after the Plaintiff returned from her medical leave. Such an extremely close temporal proximity between the protected activity and adverse actions are more than sufficient to satisfy a prima facie case of retaliation. *CaleroCerezo v. United States Dept. of Justice*, 355 F.3d 6, 25 (1st Cir. 2004). Importantly, temporal proximity has been found to exist in instances where the amount of time separating the protected activity and adverse employment action far exceeded that in the instant matter. *See*, *e.g.*, *Fasold v. Justice*, 409 F.3d 178, 190 (3rd Cir. 2005)(temporal proximity of plaintiff's disclosure of impairment and termination three months later supported an inference that retaliation had occurred); *Jurkowski v. Baystate Health, Inc.*, Civil Action No. 12-30080-KPN, Memorandum and Order with Regard to Defendants' Motion for Summary Judgment, June 25, 2013, pp. 12-14 (D. Mass. 2013)(denying employer's motion for summary judgment where the timing of the plaintiff's request for accommodation and her inclusion in a reduction in force approximately four months later "was short" and, therefore, sufficient to create a genuine issues of material fact on plaintiff's retaliation claims).

## VIII.   THE PLAINTIFF HAS VIABLE CLAIMS OF INTERFERENCE AND RETALIATION UNDER THE FMLA.

The FMLA contains "prescriptive" rights and "proscriptive" rights. *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159-160 (1st Cir. 1998). The FMLA statute entitles eligible employees up to twelve work weeks of unpaid leave (continuous or intermittent) per year when an employee has a serious health condition, making them unable to perform the functions of their job. 29 U.S.C. § 2612(a)(1) & (b); 29 C.F.R. § 825.117. An eligible employee is also entitled "to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority." *Hodgens* at 159 (internal citations omitted).

According to the First Circuit, "[t]hese rights are essentially prescriptive, 'set[ting] substantive floors' for conduct by employers, and creating 'entitlements' for employees." Hodgens, 144 F.3d at 159.  The FMLA also provides protection in the event an employee is discriminated against for exercising those rights.  The First Circuit has described these provisions as being "proscriptive." *Hodgens*, 144 F.3d at 160.

## A.  **Plaintiff's Interference Claim**

In order for the Plaintiff to succeed on an FMLA interference claim, she must prove the following elements by preponderance of the evidence: (1) that she was eligible for FMLA as an employee of the Defendant; (2) that the Defendant was a covered employer under the FMLA; (3) that she gave the Defendant adequate notice of her need to take FMLA; (4) for a covered reason; and (5) she was not returned to an equivalent position at the end of her leave. *See Furtado v. Standard Parking Corporation*, 820 F. Supp. 2d 261, 280 (D. Mass. 2011).  The Defendant does not specifically argue that the Plaintiff is unable to establish the elements of the prima facie case.

There is no dispute that the Plaintiff was eligible for FMLA as an employe of the Defendant because she was approved for an FMLA leave, beginning on April 22, 2014, and, similarly, there is no dispute that the Defendant was a covered employer under FMLA.  The Plaintiff also provided adequate notice, when she immediately informed her supervisor on or about March 24, 2014 that she needed to take a medical leave, beginning on April 22, 2014. SOFs, ¶ 88.  The Plaintiff also required the medical leave for a covered reason, being the recommended surgery to assist with the pain management of her diagnosed condition of Complex Regional Pain Syndrome. SOFs, ¶ 82, 87.  The Plaintiff was ultimately not returned to her position when the Defendant eliminated the Plaintiff's position on two weeks after the Plaintiff returned from work.  SOFs, ¶ 102.

The Defendant also interfered with the Plaintiff's FMLA leave when they told her she would need to make herself available to the company during her leave.  Mr. Zambelli told the Plaintiff that she would need to be available 24/7 and that if Mr. Zambelli needed her, then she would be required to come into the office.  SOFs, ¶ 92.  In response, the Plaintiff explained that she would not be able to comply with such a request because her reason for being on leave was that she could not drive and had other restrictions from her doctor.  SOFs, ¶ 92.  The Plaintiff again felt threatened by this conversation because she wouldn't be able to be available 24/7, feeling as if the company was failing to accommodate her.  SOFs, ¶ 92.  Mr. Zambelli also admits that he told the Plaintiff she needed to be available for questions during her leave, which included requiring the Plaintiff to come into the office as needed.  SOFs, ¶ 92.

## B.  The Plaintiff's FMLA Retaliation Claim.

The *prima facie* burden of a plaintiff on an FMLA retaliation claim requires that she show that: (1) she availed himself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse action. *Lukacinsky v. Panasonic Service Company and Ted Kent*, 2004 U.S. Dist. LEXIS 25846. As is discussed in detail above, the Plaintiff has established that the Defendant retaliated against her for, *inter alia*, exercising her rights under the FMLA.

In sum, after the Plaintiff engaged in protected activity by requesting accommodations and opposing the Defendant's discriminatory practices, she suffered adverse employment action in the form of being denied reasonable requests for accommodation and the termination of her employment. The temporal proximity between the protected activity and the termination is as minimal as about two weeks and no more than approximately eight weeks. The Defendant's

purported legitimate reason for terminating the Plaintiff's employment is undermined by its inability to decide which reason, i.e., the elimination of the Assistant Controller position or the Plaintiff's poor performance in which the Plaintiff never received any warnings.

**C. As Is Noted Above, And As Relates To The Plaintiff's FMLA Retaliation Claim, The Defendant's Articulated Reason For Its Adverse Action Is Pretextual.**

The Defendant's articulated reason for its adverse action masks its real reason for terminating the Plaintiff's employment—discrimination based on disability and retaliation under the FMLA. The Defendant's purported legitimate reason was the elimination of the Plaintiff's position. However, the Plaintiff maintains that she was discriminated against based upon her disability and requests for reasonable accommodations, including her leave under the FMLA. "The nonmoving plaintiff may demonstrate pretext either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

A supervisor's hostility towards a plaintiff's leave "is clearly probative of pretext." *Lukacinsky v. Panasonic Serv. Co.*, No. CIV.A.401410FDS, 2004 WL 2915347, at *16 (D. Mass. Nov. 29, 2004). In *Lukacinsky*, the court denied summary judgment where the plaintiff's supervisor questioned the plaintiff's absences related to his medical condition, indicating that his job was "on thin ice," considering such hostility as evidence of pretext. *Id.* Here, the Plaintiff similarly experienced hostility from her supervisors surrounding her request for a medical leave.

On or about April 21, 2014, the Plaintiff's last scheduled day of work prior to her medical leave, the Plaintiff received a threatening email from a supervisor, Ms. Moriarty. SOFs, ¶ 90, 91. When the Plaintiff went to express her concerns of this email to her direct supervisor, Mr. Zambelli, he also told the Plaintiff that she would need to be available 24/7 and that if Mr.

Zambelli needed her, then she would be required to come into the office.  SOFs, ¶ 92.  The

Plaintiff again felt threatened by this conversation because she wouldn't be able to be available

24/7, feeling as if the company was failing to accommodate her.  SOFs, ¶ 92.  In addition, the

threatening comments were by made her direct supervisor, Mr. Zambelli, and another supervisor

Ms. Moriarty, who made the decision to "eliminate" the Plaintiff's position.  SOFs, ¶ 101, 102.

When the Plaintiff returned to work, there was a list of tasks that the Plaintiff needed to

complete. SOFs, ¶ 94.  The Plaintiff attempted to complete these tasks, but neither Mr. Zambelli

nor Ms. Moriarty spoke to the Plaintiff until the date of her termination. SOFs, ¶ 94.  After the

Plaintiff returned to work, Ms. Moriarty would continuously look into the Plaintiff office to,

what seemed like to the Plaintiff, ensure that the Plaintiff was in her office. SOFs, ¶ 97.  Ms.

Moriarty stared into the Plaintiff's office multiple times per day.  SOFs, ¶ 97.

Interestingly, the Defendant spends an inordinate amount of time and energy attempting

to discredit the Plaintiff based on alleged poor performance.  Yet, the Defendant articulates its

supposed legitimate reason for the Plaintiff's termination as the elimination of her position, and

proceeds to fill said "eliminated" position shortly after the Plaintiff's termination.  Despite this

supposed "poor performance," Mr. Zambelli testified that the Plaintiff was not a bad employee,

and he did not recommend or issue a warning or performance evaluation at any point in time

during the Plaintiff's employment.  SOFs, ¶ 104.  Ms. Moriarty testified that although the

Plaintiff made errors in her work, overall, the Plaintiff was not a bad employee.  SOFs, ¶ 103.

Ms. Moriarty admits herself and other employees in the Accounting Department have made

mistakes.  SOFs, ¶ 103.  *See Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir.

2000) ("[W]hen a company, at different times, gives different and arguably inconsistent

explanations, a jury may infer that the articulated reasons are pretextual.").

Even more striking, only approximately two months before "eliminating" the Plaintiff's position, the Plaintiff's supervisors mandated that the Plaintiff come to the office during her leave in order to complete her job duties.  SOFs, ¶ 90, 91, 92.  These duties apparently could only be performed by the Plaintiff, considering much of the work was left for the Plaintiff upon her return from medical leave.  SOFs, ¶ 94.  Yet, at the same time the Plaintiff's managers indicated she must come into the office during her leave, they were simultaneously making the decision that this position should be eliminated.  SOFs, ¶ 90, 91, 92, 102.

The Defendant Company after "eliminating" the Plaintiff's position proceeded to replace the Plaintiff with Ms. Matovich.  Ms. Matovich, who never took a medical leave or any other type of handicap, took over the Plaintiff's job responsibilities after the Plaintiff's position was eliminated, which resulted in a promotion for Ms. Matovich, and relocated into the Plaintiff's prior office.  SOFs, ¶ 105.  Since the time that the Plaintiff's job was "eliminated," a new employee, Ms. LaMadeline was hired in the Accounting Department about two months after the Plaintiff's termination, and Ms. Madeline worked for Mr. Zambelli, who was also previously the Plaintiff's direct supervisor.  SOFs, ¶ 106.  The Plaintiff was qualified for this position.  SOFs, ¶ 106.  Ms. LaMadeline also never went out on medical leave.  SOFs, ¶ 106.  Mestek also hired Roger Redfield as an internal audit manager after the Plaintiff's position had been eliminated.  SOFs, ¶ 106.  Thus, there is ample evidence of pretext to support the Plaintiff's FMLA retaliation claim.

## CONCLUSION

For all the foregoing reasons, the Defendant's Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted,


The Plaintiff
KATIE KING
By Her Attorney

/s/ Michael O. Shea                     Dated: March 10, 2017
MICHAEL O. SHEA, ESQ.
BBO No. 555474
Law Office of Michael O. Shea, P.C.
3 Crane Park Drive, Suite 7
Wilbraham, MA 01095
Telephone No. (413) 596-8005
Facsimile No. (413) 596-8095
Email: owenshea@aol.com


## REQUEST FOR ORAL ARGUMENT

I, Michael O. Shea, Esq., Counsel for the Plaintiff, hereby request oral argument on the subject Motion, as oral argument will likely assist the court in a ruling on the Motion.

/s/ Michael O. Shea
Michael O. Shea


## CERTIFICATE OF SERVICE

I, Michael O. Shea, Counsel for the Plaintiff, hereby certify that on this 10th day of March, 2017, I served the foregoing document by electronic filing through the ECF system to Counsel of Record for the Defendants.

/s/ Michael O. Shea
Michael O. Shea