```
                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
                                )
KATIE KING                      )
        Plaintiff,              )
                                )
        v.                      )
                                )   C.A. No. 3:15-cv-30071-MAP
MESTEK, INC.,                   )
        Defendants.             )
                                )
                                )
                                )
```

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE
(Dkt. No. 55 and 64)

September 18, 2017

**PONSOR, U.S.D.J.**

### I. INTRODUCTION

Plaintiff Katie King brings suit under federal and state law against Defendant Mestek, Inc., her former employer, for discrimination on the basis of real or perceived disability, as well as for interference with her rights under the Family and Medical Leave Act.

On December 10, 2015, Judge Mark G. Mastroianni allowed Defendant's motion to dismiss counts III, V, and XI. Defendant now seeks summary judgment on all remaining counts in the Amended Complaint. In its reply to Plaintiff's

opposition, Defendant also asks the court to strike Exhibit 20, an affidavit by Plaintiff. For reasons set forth below, the court will allow the motion for summary judgment in part and deny the motion to strike.

II. BACKGROUND

The facts are drawn from Plaintiff's Statement of Material Facts (Dkt. No. 60.) and Defendant's Memorandum in Support re Motion for Summary Judgment (Dkt. No. 56). They are recited in the light most favorable to the non-moving party, here Plaintiff; all justifiable inferences are drawn in her favor. See Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014). The court will first discuss Plaintiff's role at Defendant and then move to an overview of her health condition.

A. Employment History

Plaintiff began her employment at Defendant in July 2012 as an Assistant Controller in the Finance Department. Her supervisor, Fran Robertson, held the position of Controller, but retired in March 2013. Also around this time, another position in the department, that of Cost Manager, opened due to a retirement. Instead of filling the

open positions, Defendant decided to evaluate the structure of the entire Finance Department. Defendant did not advertise or seek applicants for the job of Controller.

For the following six to eight months, Plaintiff had no formal supervisor. At some point in this period, Defendant's CFO, Steve Shea, asked Plaintiff if she would be interested in taking the position of Cost Manager. Plaintiff declined. Around October 2013, Timothy Zambelli became Plaintiff's supervisor. Throughout this period, Plaintiff's job responsibilities remained unchanged.

During the entire period of her employment, Plaintiff never received any formal warning that her job performance was unsatisfactory. Zambelli stated in his deposition that Plaintiff's work contained errors that required another person to double check her work. For example, in an email exchange between Jeanne Moriarty (who worked in the Accounting Department) and Zambelli, Moriarty complained about Plaintiff's work. In response, Zambelli stated that Plaintiff's work was "awful". (Dkt. No. 60 at 13.) In October 2013, Moriarty sent Plaintiff an email, copied to Zambelli, criticizing Plaintiff for failing to review

statements for accuracy and to investigate and report anomalies in allocations. Despite these negative assessments, both Zambelli and Moriarty conceded in their depositions that Plaintiff was "not a bad employee." (Id.)

B. <u>Plaintiff's Health Condition and Termination</u>

In September 2012, several months after starting her job with Defendant, Plaintiff suffered a seemingly banal injury - she stubbed her toe - that triggered a difficult medical condition called Complex Regional Pain Syndrome (CRPS). This condition is marked by chronic pain. For Plaintiff, this meant severe and constant pain in her foot and toes, for which she received ongoing and escalating treatment. For a short while after initially injuring her foot, Plaintiff wore a walking boot and used crutches. She continued using a crutch, particularly for descending stairs, for another six months after the injury. Plaintiff received injections in her foot to alleviate her discomfort. Additionally, she took medication for the pain, had great difficulty sleeping, and struggled with walking, in particular downstairs.

Shortly after first injuring her foot, Plaintiff asked

Shea if she could have an accommodation in the dress code (specifically, regarding footwear) and use a parking spot nearer to the office. Though Plaintiff cannot recall what answer she got to her requests, she admits that she did wear comfortable shoes on her injured foot and did park closer to the building in a spot that did not require crossing the street.

About a year later, in October 2013, Plaintiff received a request from Human Resources for a note from her medical provider in support of her continuing need for accommodation. Plaintiff characterizes the request as a demand with only a one-day notice. Although Defendant disputes whether Plaintiff ever provided the note, the court, accepting Plaintiff's version of the facts, must conclude that she did provide a note from the Baystate Pain Management clinic. In any event, Plaintiff received no complaint regarding the note request. Eventually, she decided on her own to stop using the parking spot closer to the building.

In February 2014, Plaintiff underwent a surgical procedure that temporarily attached needles in her spine as

part of a spinal cord simulator, with the hope that this treatment would alleviate her pain. Plaintiff returned to work with wires hanging out of her clothes. It is unclear from the record whether any of Plaintiff's co-workers noticed this.

Because Plaintiff experienced significant relief, she decided to undergo a more significant medical procedure. On March 24, 2014, Plaintiff notified Zambelli that she needed medical leave for this treatment, beginning April 22, 2014. She requested two weeks, which Defendant approved.

The day before her scheduled leave, Plaintiff forwarded to Moriarty an email from April 1, 2014, about a question related to Plaintiff's work responsibilities. In the email, Plaintiff stated that she would need more information in order to complete the task that day, the last day before her medical leave, or, alternatively, Moriarty could seek assistance from Plaintiff's supervisor, Zambelli. In response, Moriarty sent a hostile email to Plaintiff as follows:

> It's a shame you waited until today to follow up on this issue. If you are going to be out for an extended time a well-planned absence would have included following up on outstanding issued [sic]. You are in no

position to issue me an ultimatum regarding your duties
that you should have well under wraps. This should have
been resolved with the January closing. It looks like
you will have some reconciliation work upon your
return. (Dkt. No. 61 at 4.)

Plaintiff then went to speak to Zambelli about Moriarty's email. Both Plaintiff and Defendant agree that Zambelli told Plaintiff that, given the work left to do, she would have to help with her responsibilities either over the phone or by coming into the office, adding that she would have to be available "24/7" during her leave. (Dkt. No. 61 at 5.) Plaintiff felt Zambelli's comments were intended to threaten her for taking FMLA leave. Thereafter, Plaintiff spoke to Matt Brown, in Human Resources, who assured her that she would not be contacted during her leave. He reported the matter to the vice president of his department. In fact, no one from work contacted Plaintiff during her leave.

After her surgery in April, Plaintiff took two weeks of leave and then requested another two weeks, which Defendant granted. Plaintiff returned to work on May 21, 2014. At this point, according to Plaintiff, her workplace climate had changed: neither Zambelli nor Moriarty spoke to her; other

employees ignored her as well; and Moriarty would often look in on Plaintiff to make sure she was doing her work. Plaintiff felt uncomfortable and anxious.

On June 2, 2014, Defendant terminated Plaintiff. According to Defendant, it eliminated Plaintiff's position as part of a restructuring of the Finance Department. In all, three positions were eliminated. Defendant maintains that Shea, the CFO, made the final decision on eliminating the position of Assistant Controller. However, Plaintiff asserts that Zambelli and Moriarty made the actual decision, with Shea merely giving final approval. After Defendant fired Plaintiff, some of her job responsibilities were assigned to Anna Matovich, who held the position of Staff Accountant and had been with the company for almost a decade. Matovich was already familiar with much of the work, as she had filled in for Plaintiff's position both before Plaintiff was hired in 2012 as well as when Plaintiff took her medical leave. Plaintiff claims that this reassignment resulted in a promotion for Matovich, who also got Plaintiff's office. Also, Defendant hired a new employee, Amy LaMadeline, in the Accounting Department, who reported

directly to Zambelli.

Plaintiff brought this action in ten counts under state and federal law for discrimination and harassment on the basis of real or perceived disability, failure to accommodate, and retaliation for her exercise of rights. As noted, on December 10, 2015, counts III, V, and IX, all regarding Plaintiff's claims for failure to accommodate or interference under the FMLA, were dismissed. (Dkt. No. 26.) Defendant now moves for summary judgment on the remaining claims and asks the court to strike Plaintiff's Exhibit 20.

### III. DISCUSSION

At the summary judgment phase, the court looks "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.1990). Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to material fact and the movant is entitled to judgment as a matter of law." The court's task is not to weigh the evidence or determine the "truth of the matter." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

Rather, the court must determine whether the moving party has "affirmatively produce[d] evidence that negates an essential element of the non-moving party's claim" or pointed to evidence "that demonstrate[s] that the non-moving party will be unable to carry its burden of persuasion at trial." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000).

In considering a motion for summary judgment, the facts are considered in the light most favorable to the non-moving party, with all reasonable inferences drawn in her favor. Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014). The court will grant summary judgment where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id.

Discrimination and retaliation claims brought pursuant to the ADA and chapter 151B, and retaliation claims under the FMLA, are analyzed under the McDonnell Douglas burden shifting framework used in Title VII cases. See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104-105 (1st Cir. 2005) (citing to the burden shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); Benoit v. Technical

Manufacturing Corp., 331 F.3d 166, 173 (1st Cir. 2003); Hodgens v. General Dynamics Corp., 144 F. 3d 151, 160 (1st Cir. 1998). Under this approach, a plaintiff must first establish a prima facie case of discrimination or retaliation. If a plaintiff does so, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory basis for the adverse employment action. The burden then reverts back to the plaintiff to show that such reason was actually a pretext to cover discrimination or retaliation. Each of Plaintiff's claims will be assessed within this framework.

A.  Discrimination Under the ADA and Ch. 151B

To demonstrate a prima facie case of disability discrimination, Plaintiff must show that "(1) [she] suffers from a disability or handicap, as defined by the ADA and Chapter 151B, (2) [she] was nevertheless able to perform the essential functions of [her] job, either with or without reasonable accommodation, and (3) [Defendant] took an adverse employment action against [her] because of, in whole or in part, [her] protected disability." Tobin, 433 F.3d at 104. Once this showing is made, it is Defendants' burden "to

articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason." Id. at 105. Upon this showing, the burden moves back to Plaintiff to "proffer evidence to establish that [Defendant]'s non-discriminatory justification is mere pretext, cloaking discriminatory animus." Id.

Defendant contends that there is no evidence that Plaintiff had a disability or that she was perceived by her supervisors or co-workers as having one. Defendant further argues that, even assuming Plaintiff did have a disability, she cannot show that she suffered the adverse employment action of being fired because of her disability. Defendant maintains that Plaintiff's termination was made as part of a restructuring of the Finance Department, and that it was Shea, the CEO, who made the final decision, not Plaintiff's direct supervisors.

Contrary to Defendant's submissions, the record is sufficient to show that Plaintiff suffers from a disability for the purposes of the ADA and Chapter 151B, defined as "a physical or mental impairment that substantially limited one

or more ... major life activities." Benoit, 311 F.3d at 175. Plaintiff's condition, CRPS, causes her "severe and chronic pain" so as to affect her walking and sleeping. Furthermore, the record shows that Plaintiff exhibited signs of disability early on in her employment. Shortly after injuring her foot in or about September 2012, Plaintiff began to use crutches and a walking air cast for six months thereafter. On or about March 22, 2012, Plaintiff informed Defendant's human resources department and her immediate supervisor, Zambelli, that she was to undergo surgery to insert a spinal cord stimulator and requested medical leave for this. Plaintiff informed Defendant that she would not be able to drive after the surgery.

Defendant's specific challenge to Plaintiff's case - that she cannot prove a causal relation between her disability and the adverse employment - is too close a call to be made at summary judgment, particularly in light of the Defendant's failure to warn Plaintiff that her job was in danger and in light of the short time frame between her return from FMLA leave and the termination of her employment.

The absence of any formal warnings or suggestions from Defendant that Plaintiff's work was below par or that her job was in danger was compounded by Defendant's hostile response to her request for extended second medical leave. Plaintiff's supervisor, Zambelli, aggressively inquired as to whether Plaintiff would be available to answer questions that arose during her time away, a fact Defendant does not dispute. According to Plaintiff, after her return from her FMLA leave, her co-workers refused to speak to her. Finally, Plaintiff was fired only two weeks after taking medical leave. (Dkt. No. 60 at 1.)

In view of the sequence of events leading up to Plaintiff's second period of FMLA leave, Plaintiff's allegations of Defendant's hostility upon her return from leave, and Defendant's virtually immediate decision to terminate Plaintiff upon her return, there is sufficient evidence from which a jury could reasonably conclude that Plaintiff suffered an adverse employment action as a result of her disability.

B.  **Retaliation Under the FMLA**

Analysis of Plaintiff's retaliation claim is

substantially similar to the discrimination claim detailed above. To establish a retaliation claim under the ADA, Plaintiff must show that "(1) [she] engaged in a protected activity; (2) [she] suffered an adverse employment action after or contemporaneous with such activity; and (3) there existed a causal link between the protected activity and the adverse job action."  Benoit, 331 F.3d at 175.

Defendant argues, as above, that there is a lack of evidence that Plaintiff had a disability or was perceived by her co-workers as having one. Defendant also contends that Plaintiff cannot show that she was fired in retaliation for having taken FMLA leave.

Again, this argument conflicts with Plaintiff's version of the facts. Having been employed at the Defendant in a full-time position for almost two years and needing to take time off due to her serious medical condition, Plaintiff was eligible to take medical leave under the FMLA. After exercising her FMLA rights for the second time in a relatively short time frame, Plaintiff's employment with Defendant was terminated almost immediately. A jury could find that Plaintiff also received hostile comments from her

direct supervisor and from another highly placed member of the company when she requested her FMLA medical leave, and that she was treated hostilely by her co-workers upon her return from leave.

The events leading up to Plaintiff's second FMLA leave and Defendant's response when she returned, in particular Defendant's suspiciously quick decision to terminate Plaintiff after her return from leave, are sufficient evidence from which a jury could reasonably conclude that a causal link existed between the protected activity and the adverse job action. Benoit, 331 F.3d at 175. Defendant essentially concedes this point, noting that "[e]vents that occurred after the Plaintiff's return from leave could arguably give rise to a claim for FMLA retaliation." (Dkt. No. 20 at 13.)

For all these reasons, the motion for summary judgment must be denied as to Plaintiff's claim under the ADA, FMLA, and M.G.L. ch 151B for discrimination based on real or perceived disability and for retaliation.

C. Hostile Work Environment

Plaintiff has also pursued a claim for harassment under

a hostile work environment theory. To succeed, a hostile work environment claim requires, in addition to proof of other elements, evidence that the discriminatory conduct was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment." Murray v. Warren Pumps, LLC, 821 F.3d 77, 86 (1st Cir. 2016).

Plaintiff's harassment claims rest on comments and conduct by Moriarty, Zambelli and Plaintiff's co-workers.

Plaintiff reports having felt "harassed and threatened" by Moriarty's email of April 21, 2014, which stated, in part, that "a well-planned absence would have included following up on outstanding issues" and that Plaintiff would have some "reconciliation work" to do upon her return from medical leave. Plaintiff also alleges that Zambelli instructed her that she had to be on call "24/7" during the duration of her medical leave. (Dkt. No. 61 at 5.) Plaintiff further claims that, upon her return from medical leave to work on or about May 21, 2014, Zambelli and Plaintiff's co-workers gave her "the silent treatment", thus significantly interfering with Plaintiff's ability to

perform her job functions.

This conduct, while perhaps hurtful, is insufficient to establish that Plaintiff's work environment was "permeated with ... intimidation, ridicule, and insult ...." Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006). Isolated incidents, such as Moriarty's email and Zambelli's conduct, will not amount to discriminatory changes in the terms and conditions of employment unless they are extremely serious. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Even assuming that the allegedly hostile environment faced by Plaintiff upon her return from medical leave persisted until the date of her termination on June 2, 2014, such treatment does not rise to the level of severe and pervasive conduct required for a hostile work environment claim.

D. Defendant's Motion to Strike

In its Reply (Dkt. No. 64), Defendant asks the court to strike Plaintiff's affidavit as a sham pursuant to F.C.R.P. 12(f). It is well-established that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn

statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806 (1999).

While the affidavit may violate this rule, the court's ruling has not in any way relied upon this new submission. The court will therefore deny Defendant's motion to strike.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is hereby ALLOWED as to counts II and VIII with regard to Plaintiff's claims of hostile work environment. However, summary judgment is hereby DENIED as to counts I, IV, VI, VII, and X. The clerk will set forth the case for a final pre-trial conference.

It is So Ordered.

                                    /s/ Michael A. Ponsor
                                    MICHAEL A. PONSOR
                                    U. S. DISTRICT JUDGE